Archie **BURKHALTER**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 44675.

Court of Criminal Appeals of Texas.

Feb. 21, 1973.

Rehearing Denied April 25, 1973.

Second Rehearing Denied May 9, 1973.

Warren Burnett, Odessa, for appellant.

Carol S. Vance, Dist. Atty., Joe S. Moss, James C. Brough and James Moseley, Asst. Dist. Attys., Jimmy R. James, Sp. Prosecutor, Houston, and Jim D. Vollers, State's Atty., Robert A. Huttash, Asst. State's Atty., Austin, for the State.

## OPINION

ROBERTS, Judge.

The offense is accomplice to murder with malice; the punishment, life.

Appellant does not challenge the sufficiency of the evidence and, therefore, a de-tailed recitation of the facts is unnecessary. It suffices to say that appellant, a physician, was indicted as an accomplice to murder with malice in the death of Robert J. Pendleton, a fellow physician. Del Monte Whitehurst, a key prosecution witness, and two others were indicted as principals in the same offense· A companion case is Tucker v. State, Tex.Cr.App., 461 S.W.2d 630.

The primary question in this case, raised by appellant's first two contentions, is whether the trial court erred in refusing to let the jury hear evidence that the witness Whitehurst's *lawyer* had an understanding with the State that if Whitehurst testified without claiming immunity he would not be prosecuted. A special prosecutor admitted that it was the State's plan to procure witness Whitehurst's release from all charges when appellant's trial was over. Further, it was part of the plan that the State would try Whitehurst if the defense were to request immunity either in open court or otherwise. Thus, the testimony was that the arrangements were to be communicated to appellant's counsel, but not directly to appellant himself.

Appellant's strongest contention is based upon the recent opinion of the United States Supreme Court in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L. Ed.2d 104 (1972). In that case, the witness Taliento testified that:

"Nobody told me I wouldn't be prosecuted . . . I believe I still could be prosecuted."

In summation, the government attorney reiterated that no promises had been made to Taliento.

While the case was on appeal, the petitioner filed a motion for new trial based on newly discovered evidence and attached an affidavit from one of the prosecutors who was not directly involved in the actual trial stating that he had promised Taliento that all prosecutions against him would be

dismissed if he testified against an alleged co-conspirator.

The Court ordered a new trial holding that since the government depended almost entirely on Taliento's testimony, his credibility as a witness was important and the jury was entitled to know about any agreement concerning immunity.

In the case at bar, we have the testimony of the Special Prosecutor that he told Whitehurst's lawyers that if Whitehurst testified for the State without claiming immunity the prosecutions against him would be dismissed, but warned such lawyers not to convey that information to Whitehurst personally.

Attorney Farmer, Whitehurst's lawyer, testified as follows:

"But the way we stated it to him [Whitehurst] was that if he testified it could help him but that we would not promise him nor could anyone else promise him anything in exchange for his testimony."

Further,

" . . . we didn't tell Whitehurst that if he testified he would be exonerated from this case or any other case. We merely stated that if he testified it could help him."

Quoting Farmer's testimony further:

"Q You did not promise him any particular results, of course.

"A No, sir."

Arguably, the Giglio opinion has no application in the present case, since there is no showing here that the prosecutor ever spoke directly with or conveyed to Whitehurst a *direct promise* that he would not be prosecuted if he testified for the State.

We have closely examined the Giglio decision and we cannot agree that the case turned on this point. Nowhere does the U.S. Supreme Court make such a distinction and we certainly will not imply one. We quote from Giglio:

"Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of *any understanding or agreement* as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." (emphasis supplied)

The court did not say "any agreement between the witness and the prosecutor" or "in cases where the agreement is directly conveyed to the witness." Such language unduly restricts the very reasoning behind Giglio: that is, that the jury should have the opportunity to decide the witness's credibility for themselves.

We recognize the argument that while the witness's state of mind while testifying and his expectations were not mentioned in Giglio, the court there was faced with a different factual situation. Admittedly, that court was not faced with and did not address a situation where the witness granted immunity was completely ignorant of any agreement as to future prosecution. In our opinion, neither is it clear that this Court is presented with such a case.

The record reveals the following colloquy, heard during the motion for a new trial:

(Testimony of Whitehurst's attorney)

"A . . . and we were careful not—I was careful, and I assume Mr. Neisig was, I know he was, we were together, that he didn't tell Whitehurst that if he testified that he would be exonerated from this case or any other cases. We merely stated that if he testified that it could help him.

"Q If he testified it could help him?

"A If he testified it could help him.

"Q You did not promise him any particular results of course?

"A No, sir.

"Q But you did tell him that if he testified that it could help him?

"A If he wanted to testify, it could possibly help him.

"Q In other words, it would be fair to say that he was allowed to know that if he testified that it could be of benefit to him?

"A It could be.

"Q He was made to know that?

"A We communicated that to him. But that was as far as we went with this."

Thus, the record indicates that both Whitehurst and his attorney admitted that, although no direct promise of immunity from prosecution was ever conveyed to Whitehurst, he was told that his testimony "could help his case." We find it unrealistic to draw a line between an outright promise not to prosecute and a very real inference not to prosecute.[1] The suggestions and innuendos in the present case bring appellant within the rule announced in Giglio.

 Further, evidence that witness Whitehurst was not completely in the dark is revealed by the record, in reference to the visit by Phil Greene. Mr. Greene, an attorney, allegedly called on Whitehurst during the course of the trial and urged him to seek immunity before testifying.

With Whitehurst testifying, the record reflects:

"A Well, it was a lawyer who come up to visit me the other night who wanted to represent me. He told me that he would get me immunity out of this murder case and would handle all of the other charges for me. He almost demanded that I come down here and take immunity. It took me two hours last night to run him off.

* * * * * *

"Q You deny that you are expecting that?

"A I was offered that last night. I turned it down.

"Q So now your testimony before the jury is that you were offered that you could go absolutely scot-free, but that you turned it down?

"A Yes, sir.

"Q You don't want to be scot-free, right?

"A Well, I didn't want to look at it the way he was trying to do it."

Surely, it must have struck the trial judge as unusual, to say the least, that a co-indictee in a murder case would "run off" an attorney who suggested that he should go into open court and demand immunity before testifying. One reasonable inference to be drawn from Whitehurst's actions is that he knew of the State's plan

---

1. In Giglio, two different affidavits were filed in reference to newly discovered evidence. One affidavit states outright that a promise was made to Taliento that if he testified, he would not be prosecuted. The second affidavit (which the U.S. Supreme Court saw fit to set out in the text of their opinion, rather than in a footnote, as they did with the first affidavit) stated that: "he [the U.S. Attorney] had personally consulted with Taliento and his attorney shortly before trial to emphasize that Taliento would definitely be prosecuted if he did not testify and that if he did testify he would be obliged to rely on the 'good judgment and the conscience of the government' as to whether he would be prosecuted." The court noted that this latter affidavit, standing alone, contains at least an *implication* that the government would reward the cooperation of the witness, and hence, "tends to confirm rather than refute the existence of some understanding for leniency." Giglio, supra, 405 U.S. at p. 153, 92 S.Ct. at p. 765, 31 L.Ed.2d at p. 108. It, thus, appears to this Court that even in Giglio, there was some question as to the "directness" and unequivocality of the agreement not to prosecute.

not to prosecute, but also knew not to mention it for fear of jeopardizing the entire scheme. Whether or not this is true is not for us to decide. The point is that *the jury should have been given the opportunity to judge Whitehurst's credibility for themselves*. The trial court's refusal to permit disclosure of the State's plan not to prosecute Whitehurst deprived the jury of that function.

■ Further, we find that such a deprivation amounted to a denial of due process. It is axiomatic that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction. This rule does not cease to apply merely because the false testimony goes only to the credibility of the witness. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed. 2d 1217 (1959). As recognized in Napue, the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence.

We fully appreciate the State's position that there was no false evidence here, since Whitehurst did not *know* that he would not be prosecuted. Even if we assume this ignorance, arguendo, we find that the prosecutor's silence as to the plan not to prosecute conveyed an impression to the jury which the State knew to be false and one which should have been corrected. On cross-examination, Whitehurst gave the following testimony:

"Q And you fully expect that when this case is over, not only will you be out of this case but all other charges against you?

"A No, sir."

Appellant was not accorded due process of law when he was denied the opportunity to refute the inevitable impression that such testimony had on the jurors; that is,

that Whitehurst would obtain no reward for testifying. Defense counsel should have been permitted to place the parties in proper perspective and develop further the interests involved.[2] cf. Alcorta v. Texas, 355 U.S. 32, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957).

The State answers that if there was any error in refusing to let the jury hear the disputed testimony, it was harmless error. We disagree.

Whitehurst was the only source of direct testimony tending to establish the alleged main fact of appellant's advising the commission of the offense charged in this case. As previously stated, it is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon appellant's guilt.

"A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. * * * That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair." Napue, supra, 360 U.S. at p. 269, 79 S.Ct. at p. 1177.

We cannot pretend to be oblivious to the time and expense involved in the presentation of this cause; the voluminous record now before this Court is sufficient evidence of that. Our intent is not to punish the trial court or the prosecutor for the error committed, but rather to avoid an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. 1 C. McCormick & R. Ray, Texas Evidence, § 673 (2d ed. 1956) states: "Where an accomplice in the crime with which accused is charged testifies for the prosecution this is a circumstance affecting his credibility. It indicates a probability that he is seeking or has been promised favor at the hands of the State."

■ Our holding today is not to be taken as a ruling that the procedure used by the State here is unconstitutional per se. Certainly, each case must turn on its particular circumstances. In the instant case, the State could easily have preserved Whitehurst's "unawareness" and, at the same time, protected appellant's constitutional guarantees. The rule had been invoked at the beginning of the trial. Therefore, the State could have presented testimony before the jury disclosing the plan with Whitehurst's attorney and thereby have permitted them to judge his credibility. In such a circumstance, and where the witness is indeed non-cognizant of the plan, we would commend the prosecution.

We simply hold that Giglio, supra, is constitutionally dictated and cannot be cleverly circumvented in this case by the scheme used by the State. Due process, perhaps the most fundamental concept in our law, embodies principles of fairness rather than an immutable line drawing as to every aspect of a criminal trial. Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). See also Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

In light of the disposition of this ground of error, we will not consider appellant's other grounds.

The judgment is reversed and the cause remanded.

MORRISON, Judge (dissenting).

I am thoroughly in accord with the holding of the Supreme Court of the United States in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104. I have concluded that the circumstances in the case at bar, though similar to those in Giglio, supra, are, nonetheless, factually distinguishable.

Giglio, supra, revolves around the jury's right to know "of any understanding or agreement as to future prosecutions" between a witness and the State as an aid in judging the witness' credibility. In Giglio, supra, there was a consummated agreement between the witness and the prosecution. The jury was not only ignorant of the agreement, but the witness, Taliento, lied to them about its existence.

In the case at bar, there is no evidence to indicate that *the witness* Whitehurst knew he would be granted immunity or that he had lied to the jury about his prospects for receiving it. The majority claims that the court erred in failing to permit the jury to hear testimony which would have shown the State planned to grant Whitehurst immunity. However, the prosecution's intention is not the critical factor. The rationale for permitting the jury to hear testimony about an "arrangement" is that such information may be a factor in determining the witness' credibility. The witness' motives and bias, then, are the controlling element. It, therefore, follows that the jury need not be given more information than the witness himself actually possesses.

Further, it cannot be said the jury was unaware of Whitehurst's position and possible motives. Appellant's vigorous cross-examination of Whitehurst included thorough questioning about the possibility that his testimony might earn him a dismissal of charges against him. Certainly these various references to immunity, dismissal, and other cases pending against Whitehurst, including an indictment for Pendleton's murder, were sufficient to alert the jury to Whitehurst's interest in the case.[1]

---

1. Some of the evidence brought out before the jury included:
 "[Prosecutor] You are the same Del Monte Whitehurst that has been indicted for the killing of Robert Pendleton, is that correct?

"[Whitehurst] Yes, sir"
In addition to the testimony in Footnote (3), infra, Defense Counsel Burnett argued to the jury:
 "One must wonder what will become of Del Monte Whitehurst as a result of

In United States v. Blackwood, (2 Cir.) 456 F.2d 526, the U. S. Court of Appeals for the Second Circuit considered a similar situation stating:

" . . . A defendant's major weapon when faced with inculpatory testimony of an accusing witness often is to discredit such testimony by proof of bias or motive to falsify. . . . The rule is that [in] attempting to establish the motives or bias of a witness against him, a defendant may . . . elicit evidence showing that the government made explicit promises of leniency in return for cooperation.

\* \* \* \* \* \*

"A defendant's right to elicit such evidence, however, is not boundless, but is subject to reasonable limitations imposed by the trial judge in the exercise of sound discretion. The test for determining whether there has been an abuse of discretion is whether 'the jury was otherwise in possession of sufficient information concerning formative events to make a "discriminating appraisal" of a witness' motives and bias.' "

The Court there concluded, as I do here: "We are satisfied that the circumstances from which the jury could decide whether [the witness] might have been inclined to testify falsely in favor of the government were adequately presented to the jury in this case."

The only suggestion that more existed than was made known to the jury comes from the defense. Whitehurst's testimony was critical to the prosecution, perhaps determinative. It is reasonable to assume that appellant's trial strategy would include an effort to discredit the witness' testimony. It is not surprising that appellant's attorney cross-examined Whitehurst extensively concerning his prospects for immunity. Counsel concentrated particularly on Whitehurst's conversation with "a lawyer who came to see him the other night. . . . [He] gave his name as Phil Green." [2]

Who was Phil Green? He was not on the prosecutor's staff nor was he appointed by the court to represent Whitehurst. The record does not reflect his exact connection with the case. The record does, however, suggest he played a role in the defense's effort to discredit Whitehurst's testimony by attempting to compromise him. Whitehurst testified that Green came to see him shortly before he was scheduled to testify and told him that if he demanded immunity during the trial, he, Green, would arrange to have Warren Burnett, Burkhalter's trial attorney, and another, represent him in the cases pending against him.[3] Burnett, himself, confirmed Green's

---

the perjury that he gave in this case. One must wonder what advantage he has earned. One must wonder what will become of him in the days and in the weeks to come after this trial is concluded. One must wonder what will become of the charges against Del Monte Whitehurst. One must wonder whether they will be dismissed. One must wonder whether or not he will go scot-free. One must wonder if his plan so wicked and so beyond description has worked. One must wonder if he succeeded in his effort to earn advantage for himself. One must ask to receive this earning, if when this trial is over, if there will be a dismissal of all of the murder charges against Whitehurst."

2. This name is variously spelled Green and Greene.

3. Burnett's cross-examination of Whitehurst concluded with the following:

"Q. You did not have a conversation yesterday with the Special Prosecutor in the case, Mr. Jimmy James?

"A. Well, it was a lawyer who come up to visit me the other night who wanted to represent me. He told me that he would get me immunity out of this murder case and would handle all of the other charges for me. He almost demanded that I come down here and take immunity. It took me two hours last night to run him off.

\* \* \* \* \*

"Q. You fully expect that when this case is finally concluded, that you will be out, don't you?

"A. No, sir. That is what the lawyer wanted to get done for me last night.

visit to Whitehurst during his argument to the jury. A demand for immunity by Whitehurst, particularly during the trial, would have placed the State in the position of either granting the immunity or dismissing the prosecution. If immunity were granted the defense could launch an unrestrained attack on the reliability of the witness' testimony.

It is obvious from the record that the jury knew of the possibility of immunity and that they were in a position to judge his credibility accordingly. I would, therefore, reject appellant's effort to hoodwink the jury and this Court. Certainly the logic and rationale of Giglio, supra, should not be read to permit or encourage the defense tactics in evidence here.[4] I respectfully dissent.

DOUGLAS, J., joins in this dissent.

## ON STATE'S MOTION FOR REHEARING

DOUGLAS, Judge (dissenting).

The majority overrule the State's motion for rehearing. The conviction was re-versed because appellant was not allowed to prove before the jury that the special prosecutor James had told counsel for the accomplice witness Whitehurst that he would not be prosecuted even though this was not communicated to the witness. While I agree with practically everything that was said in the original dissent, my views are set out below:

The record shows that this is a case where the appellant, Dr. Burkhalter, hired the accomplice witness Del Monte Whitehurst and others to kill Dr. Burkhalter's partner, Dr. Pendleton. There had been some personal difficulties between the two doctors and Dr. Burkhalter was to benefit from an insurance policy on the life of Dr. Pendleton.

The majority based the reversal upon the case of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104. In that case there was a direct agreement with the accomplice witness Taliento to grant him immunity. In the present case all the testimony in the record at the trial and on the motion for new trial shows that there was no communication or agreement with the

"Q. And you fully expect that when this case is over, not only will you be out of this case but all other charges against you?
"A. No, sir.
"Q. You deny that you are expecting that?
"A. I was offered that last night. I turned it down.
* * * * *
"Q. He wanted you to do it in open court, didn't he?
"A. Well, I give a statement and agree to testify and then wait until the trial got halfway through and come on down and demand that I wasn't going to get on the stand unless I get immunity.
"Q. He wanted you to do it in open court, didn't he?
"A. He wanted me to do it when I come down for them to put me on the stand."
In answer, Prosecutor James questioned Whitehurst on redirect examination:
"Q. Let's talk about this lawyer that came up to see you: Do you know what his name is?
"A. Yes, sir.
"Q. What is it?
"A. He gave it to me as Phil Green.

"Q. Some time late last night did he tell you he wanted to represent you?
* * * * *
"A. He told me that if I would let him come to the courtroom and demand immunity this morning, that Bob Tarrant and Mr. Burnett would represent me on the rest of my cases that I have pending against me.
"Q. So this was the good deal he offered you, to represent you—if you got immunity in this case—on your other cases, is that correct?
"A. Yes, sir.
"Q. Did you send for this lawyer?
"A. No, sir.
* * * * *
"Q. So all of a sudden out of a clear blue sky, now appears the saving angel, is that correct?
"A. Yes, sir.
"Q. He is going to do wonders for you along with Mr. Burnett and Tarrant, is that correct?
"A. Yes, sir."

4. Robert D. Tucker, Jr.'s, 99-year conviction was affirmed by this Court (461 S.W.2d 630) on Del Monte Whitehurst's testimony.

witness Whitehurst that he would not be prosecuted. These two fact situations are quite different.

How would statements between counsel affect the credibility of a witness who had not heard nor been informed about the conversation? No fact issue was made. Giglio v. United States, supra, was reversed because there was an agreement, or at least an affidavit by a prosecutor, that there was a direct agreement with the witness that immunity would be granted him if he testified.

The majority, in reversing the conviction in the present case, stated: "Arguably, the Giglio opinion has no application in the present case, since there is no showing that the prosecutor ever spoke directly with or conveyed to Whitehurst a *direct promise* that he would not be prosecuted if he testified for the State."

The majority in the above quote have made the obvious distinction and by omitting the word "arguably" the statement would be entirely correct.

In the next paragraph the majority state that they would not agree that the Giglio decision turned on this point. This statement is correct because the fact situation in the present case was not before the Supreme Court when it handed down the Giglio decision.

The majority state:

"We find it unrealistic to draw a line between an outright promise not to prosecute and a very real inference not to prosecute."

and

"The suggestions and innuendos in the present case bring appellant within the rule announced in Giglio."

Then the majority, using the testimony about the attorney Green who, this record shows, had no authority to make any prom-

ise to Whitehurst, offered to have defense counsel in the present case defend him if he would claim immunity in open court.

Surely, it must have struck the trial judge as unusual, to say the least, that a lawyer without being sent for and who was in an apparent violation of the code of ethics would go to the jail and offer the services of appellant's counsel in the present case to Whitehurst in his future trials.

Counsel for the defense have not attempted to show that this attorney who visited Whitehurst was sent by the prosecution, nor have they shown that defense counsel did not send him so that they might argue before the jury about what occurred.

Cannot some sort of an inference be reached when any co-defendant testifies for the State against a defendant?[1] Does it not follow from the majority opinion that in each case where a co-defendant testifies for the State that no promises have been made him, that a defendant can then call the assistant district attorney trying the case, the first assistant district attorney, the district attorney and perhaps other prosecutors to determine if the prosecution intended to dismiss charges or grant immunity? This would be analogous to the present situation though no promise had been made. The defense could explore the minds of those in the district attorney's office to determine their future plans because the innuendos or inferences would be there.

The majority state that they appreciate the State's position that there was no false evidence here since Whitehurst did not know he would not be prosecuted. Then it is stated, "Even if we assume this ignorance, arguendo, we find that the prosecutor's silence as to the plan not to prosecute conveyed an impression to the jury which the State knew to be false and one which should have been corrected." It has always been the rule that when witnesses

1. 1 C. McCormick & R. Ray, Texas Evidence, Section 673 (2d ed. 1956).

testify before a trial judge, it is his and not this Court's function to decide their credibility. There is nothing for this Court to assume. The witnesses at the trial, outside the presence of the jury, and on the motion for new trial, were heard by the trial judge. He saw and heard the witnesses and observed their demeanor on the stand. He apparently believed them, because he did not grant a new trial.

Again, referring to the example where the prosecutor in his mind had decided not to prosecute a co-defendant witness for the State who testifies that he expects to be prosecuted: Does the prosecutor then and there have to inform the jury that he does not expect to prosecute to keep from leaving a false impression before the jury?

The majority quote from Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959): "A lie is a lie, . . ." That case holds that the district attorney has a duty to correct what is false. In the present case no lie or false testimony has been shown. No correction was required; no fact issue created.

It was shown that Whitehurst was an ex-convict. He had served sentences in New Mexico and in Texas. He obtained the "trigger man" and helped carry out the murder in the present case. There is no doubt that he hoped to obtain leniency and just as much as the State would recommend, but still there is no proof that leniency or immunity was offered to him. It does not take much logic or common sense for anyone to realize that he was not going to incriminate himself unless he thought his chances for at least some leniency was good. Jurors have common sense and they no doubt thought Whitehurst was testifying in an effort to help himself. They heard the evidence that he had been convicted before. They could and probably did infer that he wanted to help himself.

If there was any doubt that the jury did not have this in mind, it was erased when counsel for the defense argued that one must wonder if the charges against Whitehurst will be dismissed and if he would go "scot free" and "one must wonder if he succeeded in his effort to earn advantage for himself."

No constitutional or statutory right was denied the appellant. This reversal is apparently on some new rule or concept that proof to disprove an innuendo or suggestion on a collateral matter must now be admitted even though all of the direct evidence is to the contrary.

This Court has always permitted impeachment of a witness on what he says and what he does to show bias or interest. See Jackson v. State, Tex.Cr.App., 482 S. W.2d 864. No prior inconsistent statement is shown in the present case. The rules for impeachment because of a prior inconsistent statement are clear, but by what rules may one impeach an innuendo or a "very real inference not to prosecute?"

For the above reasons, the State's motion for rehearing should be granted and the judgment affirmed.