# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-09-00209-CR

**Christopher Robles, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
NO. D-1-DC-08-900367, HONORABLE FRED A. MOORE, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Appellant Christopher Robles intentionally caused the vehicle he was driving to collide multiple times with another vehicle, driven by his girlfriend, Bianca Ybarra, in which their one-year-old son was also a passenger. A jury convicted Robles on three counts: (1) deadly conduct, *see* Tex. Penal Code Ann. § 22.05(a) (West 2003); (2) endangering a child with a motor vehicle, *see id.* § 22.041(c) (West Supp. 2009), and (3) assault family violence, *see id.* § 22.01(b)(2) (West Supp. 2009). Robles argues that the district court erred in failing to grant a motion for continuance based on the State's late *Brady* disclosure, in instructing the jury on the deadly weapon issue, and in denying his motion for new trial based on *Brady* and *Giglio* violations. We affirm the judgment of conviction.

At the time of the offense, Robles and Ybarra were in a dating relationship. Their son was one year old. On August 8, 2008, Robles and Ybarra had been out with friends and fallen

asleep at the house of Ruby Reyes, one of Robles's friends. When Robles awoke around 1:00 p.m., Ybarra was gone. Robles called his mother, Clara Mendez, and learned that Ybarra had stopped by Mendez's apartment earlier that day. Ybarra told Mendez that she planned to end her relationship with Robles and picked up their son. Upset upon learning this information, Robles borrowed Reyes's vehicle to search for Ybarra. Eventually, Robles spotted Ybarra in her vehicle at the intersection of South Congress and Sheraton in Austin. Robles motioned for Ybarra to pull over, but she refused. Ybarra pulled into the H.E.B. parking lot at Oltorf and South Congress, where she attempted to flag down a security guard. It was there that Robles rammed Ybarra's vehicle the first time. Ybarra then drove across the street to a Wells Fargo parking lot, where Robles rammed her vehicle a second time. There, Robles exited the vehicle he was driving and yelled for Ybarra to pull over the car. Ybarra managed to drive away and headed toward Mendez's apartment complex, east of Interstate 35, on or near Wickersham Lane.

When Ybarra arrived, she began honking and screaming for Mendez to call 911. Robles followed Ybarra into the parking lot, accompanied by a third vehicle, where he again rammed Ybarra's vehicle. Robles exited his vehicle and managed to enter Ybarra's vehicle, where he shoved and hit her. Eventually, Robles stopped, yelled to the driver of the third vehicle to "get me out of here," and left.

When police responded to the 911 call, they found Ybarra upset, with visible injuries, including bruises and scrapes, on her arm and foot. Police observed damage to the car, including damage to the back bumper, headlights, and mirror, and scratches along the sides of the car.

2

Robles was indicted on three counts: (1) aggravated assault, *see id.* § 22.02(a)(2) (West Supp. 2009); (2) endangering a child with a motor vehicle, *see id.* § 22.041(c); and (3) assault family violence, *see id.* § 22.01(b)(2). A jury convicted Robles as charged, except as to aggravated assault, convicting him instead of the lesser-included offense of deadly conduct. *See id.* § 22.05(a). The jury sentenced him to 365 days in jail for the first count, sixteen years in prison for the second count, and twenty years in prison for the third count, with all three sentences to run concurrently. Robles argues that the district court erred in failing to grant a motion for continuance based on the State's late *Brady* disclosure, in instructing the jury on the deadly weapon issue, and in denying his motion for new trial based on *Brady* and *Giglio* violations.

In his first and third points of error, Robles argues that the district court erred in denying his motion for continuance and his motion for new trial based on a *Brady* violation. Robles argues that the State's failure to disclose any of Ybarra's prior criminal history until the morning of trial, including information that she was on felony probation for a drug offense, violated his right to due process. Robles further contends that his due process rights were violated because the State never produced accurate information relating to Ybarra's misdemeanor conviction for failure to identify. According to Robles, the district court's failure to grant a continuance following the State's disclosure that Ybarra was on felony probation, and the district court's failure to grant a new trial based on the State's failure to disclose that Ybarra was convicted for failure to identify, violated his right to due process.

We review a trial court's ruling on both a motion for continuance and a motion for new trial for abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007)

3

(continuance); *Webb v. State*, 232 S.W.3d 109, 110 (Tex. Crim. App. 2007) (new trial). To establish that a trial court abused its discretion in denying a motion for continuance, there must be a showing that the defendant was actually prejudiced. *Gallo*, 239 S.W.3d at 764. A trial court abuses its discretion in denying a motion for new trial only when, viewing the evidence in the light most favorable to the trial court's ruling, no reasonable view of the record could support the trial court's ruling. *Webb*, 232 S.W.3d at 110.

Under *Brady v. Maryland*, a prosecutor is required to disclose to an accused material information that is exculpatory. 373 U.S. 83, 87 (1963). The suppression of such evidence, whether willful or inadvertent, violates a defendant's due process rights. *Id.*; *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). To meet his burden under *Brady*, a defendant must show that:

> in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense.

*Webb*, 232 S.W.3d at 115 (quoting *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002)). A defendant cannot meet his burden under *Brady* where, despite late disclosure, evidence is nonetheless disclosed in time for him to use it in his defense. *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999). Even when *Brady* evidence is disclosed at trial, if the defendant received the information in time to use it effectively at trial, his *Brady* claim fails. *Id.*

At a pretrial hearing on the morning of trial, defense counsel received information that Ybarra was on probation related to felony drug charges. In light of this information, Robles

4

sought to continue the trial. The district court denied Robles's motion for continuance, and voir dire began that afternoon. Ybarra, however, did not testify until the following afternoon. In such circumstances, we cannot say that the district court abused its discretion in refusing to grant Robles's motion for continuance or motion for new trial based on *Brady*. *See Gallo*, 239 S.W.3d at 764; *Webb*, 232 S.W.3d at 110. Robles received the information prior to trial, and had adequate time to review the information and to prepare to cross examine Ybarra accordingly the next day.

The record shows that, before defense counsel questioned Ybarra about the specifics of the incident, he questioned her about her probation, noting that there was "some problem" with her probation and suggesting that she, therefore, had reason to be afraid of the district attorney. Despite the availability of the information, defense counsel otherwise made no attempt to use Ybarra's felony conviction to question her credibility. Robles points to no evidence—and we find none—to suggest that he was unable to adequately cross examine Ybarra or that the late disclosure of information related to Ybarra's felony drug probation affected the outcome of the trial. *See Gallo*, 239 S.W.3d at 764; *Webb*, 232 S.W.3d at 115. Accordingly, we overrule Robles's first point of error.

In his third point of error, Robles challenges the district court's denial of his motion for new trial in light of the State's failure to disclose accurate information as to Ybarra's misdemeanor conviction for failure to identify. *See* Tex. Penal Code Ann. § 38.02 (West Supp. 2008). Robles claims that he was prejudiced because he was unable to use this conviction to impeach Ybarra. The State admits that, due to an error in Ybarra's criminal history record, it

5

inadvertently failed to disclose the conviction, but argues that, even if disclosed, the conviction would have made no difference to the outcome of the trial.

Ybarra was arrested for failure to identify in December 2005. A person commits the offense of failure to identify if he:

> intentionally gives a false or fictitious name, residence address, or date of birth to a peace officer who has:
>
> (1) lawfully arrested the person;
>
> (2) lawfully detained the person; or
>
> (3) requested the information from a person that the peace officer has good cause to believe is a witness to a criminal offense.

*Id.* Following a traffic stop of a vehicle in which she was a passenger, Ybarra presented several false identification cards to officers before officers finally found a student identification card that correctly identified her. Based on this incident, Ybarra was convicted for failure to identify. Robles argues that, had this information been disclosed to him, he could have used it to impeach Ybarra's credibility, and the outcome of the trial would have been different.

Reviewing this evidence with all the evidence presented at trial, however, we do not agree with Robles that the presentation of this evidence would have affected the outcome of the trial. *See Hampton*, 86 S.W.3d at 612. Ybarra's version of events was supported by the testimony of Robles's mother and stepfather as well as a witness who was in the parking lot of Mendez's apartment complex when the events at issue occurred. Observations made by responding officers also supported Ybarra's testimony. Only certain statements made by Robles contradicted Ybarra's

6

version of events. In addition, evidence that Ybarra was on probation on felony drug charges was raised by defense counsel without objection. The fact that Ybarra was on felony drug probation could also have been presented to impeach Ybarra, but defense counsel did little to develop the evidence beyond suggesting that "some problem" with the probation caused Ybarra to be afraid of the district attorney.

Given that, with the exception of Robles's testimony, the evidence is entirely consistent with Ybarra's version of events and given that evidence that Ybarra was on felony probation was admitted and available for purposes of impeachment, we cannot conclude that additional evidence of a misdemeanor conviction for failure to identify more than three years earlier would have had any effect on the outcome of the trial. *See id.* Accordingly, we overrule Robles's third point of error.

In his second point of error, Robles argues that district court erred in instructing the jury on the issue of deadly weapon. Based on this instruction, the jury found that Robles used his vehicle as a deadly weapon. Robles contends that the evidence did not support a deadly weapon submission to the jury and that the evidence was both legally and factually insufficient to support the jury's finding that Robles used his vehicle as a deadly weapon.[1]

---

[1] While it is not entirely clear whether Robles argues that the deadly weapon jury instruction should not have been submitted at all because there was no evidence to support it or whether he argues that insufficient evidence supports the jury's finding as to use of a deadly weapon, we analyze either argument as a challenge to the sufficiency of the evidence. *See Yandell v. State*, 46 S.W.3d 357, 363 n.2 (Tex. App.—Austin 2001, pet. ref'd) (citing *Cook v. State*, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993)).

7

In reviewing a legal sufficiency challenge, we view the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005). The jury, as the trier of fact, "is the sole judge of the credibility of the witnesses and of the strength of the evidence." *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). The jury may choose to believe or disbelieve any portion of the testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). The jury may also draw reasonable inferences from basic facts to ultimate facts. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). When faced with conflicting evidence, we presume the trier of fact resolved conflicts in favor of the prevailing party. *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

In evaluating the factual sufficiency of the evidence, we view all the evidence in a neutral light and will set aside the verdict only if we are able to say, with some objective basis in the record, that the conviction is clearly wrong or manifestly unjust because the great weight and preponderance of the evidence contradicts the jury's verdict. *Watson v. State*, 204 S.W.3d 404, 414-17 (Tex. Crim. App. 2006). We cannot conclude that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of that conflict, and we do not intrude upon the fact-finder's role as the sole judge of the weight and credibility of witness testimony. *See id.* at 417; *Fuentes*, 991 S.W.2d at 271. The fact-finder may choose to believe all, some, or none of the testimony presented. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *Bargas v. State*, 252 S.W.3d 876, 888 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In our review, we discuss the evidence that, according to appellant, undermines the jury's verdict. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

The penal code defines "deadly weapon" as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(B) (West Supp. 2009). Objects that are not usually considered dangerous weapons may become so, depending on the manner in which they are used during the commission of an offense. *Thomas v. State*, 821 S.W.2d 616, 620 (Tex. Crim. App. 1991). A motor vehicle may become a deadly weapon if the manner of its use is capable of causing death or serious bodily injury. *Ex parte McKithan*, 838 S.W.2d 560, 561 (Tex. Crim. App. 1992). Specific intent to use a motor vehicle as a deadly weapon is not required. *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000); *Walker v. State*, 897 S.W.2d 812, 814 (Tex. Crim. App. 1995).

The evidence here is sufficient to allow a rational trier of fact to find beyond a reasonable doubt that Robles's manner of using the vehicle posed more than a hypothetical potential for danger if others had been present. *See Mann v. State*, 13 S.W.3d 89, 92 (Tex. App.—Austin 2000), *aff'd*, 58 S.W.3d 132 (Tex. Crim. App. 2001); *see also Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005) (deadly weapon finding requires evidence that other people were put in actual danger). Robles's manner of using his vehicle was capable of causing death or serious bodily injury to Ybarra, to their one-year-old son, and to other drivers, and the evidence shows that Robles's use of his vehicle put Ybarra, their son, and other drivers in actual danger. Robles repeatedly rammed Ybarra's vehicle, in which the couple's one-year-old son was a passenger. While the actual ramming occurred in parking lots, the evidence also shows that Robles repeatedly attempted to

9

"pull Ybarra over" or to run her off the road. At least once, he caused Ybarra to cross over the center line of South Congress Avenue into oncoming traffic.

Detective Chad Francois testified that Robles's manner of driving could cause death or serious bodily injury. Ted Murales, Robles's accident reconstruction expert, also testified that death or serious bodily injury could result when one car attempts to run another off the road. Whether either witness had ever actually observed death or serious bodily injury as a result of one car ramming another is irrelevant. The evidence shows that Robles intended to run Ybarra off the road, and both Francois and Murales agree that, in such circumstances, death or serious bodily injury could result. Indeed, the evidence here shows that Ybarra was forced into oncoming traffic at least once during Robles's pursuit, and the damage to her vehicle is consistent with her having been sideswiped. Viewed both as a whole and in the light most favorable to the verdict, this evidence is sufficient to allow a rational trier of fact to find beyond a reasonable doubt that Robles used his vehicle as a deadly weapon. *See Salinas*, 163 S.W.3d at 737; *Watson*, 204 S.W.3d at 414-17. Accordingly, we overrule Robles's second point of error.

In his fourth point of error, Robles argues that the State's failure to notify him of conversations with Ybarra about a possible immunity agreement violates his due process rights and entitles him to a new trial. *Giglio v. United States*, 405 U.S. 150 (1972), sets forth the requirement that the State disclose any agreement with a witness that may affect that witness's credibility. No formal agreement is required. Rather, courts have focused on whether—based on the State's assurances to the witness—the witness's credibility could be compromised. *See id.* at 155 (where Government's case depended almost entirely on testimony of one witness, "evidence of any

10

understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it"); *Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. 2008) (jury should have heard evidence that State informed testifying witness that he "would definitely be prosecuted if he did not testify, and that if he did testify he would be obliged to rely on the 'good judgment and conscience of the Government' as to whether he would be prosecuted"); *Granger v. State*, 683 S.W.2d 387, 389 (Tex. Crim. App. 1984) (jury was entitled to hear evidence that State and witness had understanding that her testimony would be rewarded by reduction in her death sentence to term of years); *Burkhalter v. State*, 493 S.W.2d 214, 215-18 (Tex. Crim. App. 1973) (State's assurances to witness that his testimony could help him were relevant to witness's credibility and should have been disclosed to defense, even absent formal agreement). Thus, the point of *Giglio* and its progeny, as these cases relate to immunity, is that jurors should have the opportunity to judge the witness's credibility for themselves. *See Burkhalter*, 493 S.W.2d at 216.

Here, the issue of immunity arose when defense counsel indicated that he planned to question Ybarra, who was on probation, about her alleged drug use the night before the offense. In response to this information, the district court appointed Ybarra an attorney. Before Ybarra's attorney arrived, an assistant district attorney spoke with Ybarra and later described their conversation:

> I explained to Ms. Ybarra that she was our next witness and that the defense had informed me that they intended to cross examine her and accuse her of using drugs with the defendant the night before the offense. I explained that when a person is going to be accused of violating their probation by using drugs, they have a right not to testify. I explained that if a person chose not to testify the State would then decide whether or not to offer immunity to that person. I explained that if the State granted a witness immunity, that witness no longer had a right not to testify. I then told her

11

that Mr. Browning was on his way to court to serve as her attorney. I told her that she should go over with Mr. Browning what I had just finished telling her was the law, so that she would have confirmation from her own attorney that I was accurately telling her what the law was. At that point she said she would testify and denied using drugs the night before the offense. I did not make an immunity agreement with Ms. Ybarra.

Ybarra later explained:

At that point, I decided to go ahead and testify without immunity and felt that it was not needed. At that point, I believed the State was prepared to give me immunity if I asked for it.

This evidence shows that, although the law regarding immunity was discussed, there was never any offer of immunity or an agreement relating to immunity—formal or otherwise. The district attorney merely explained that Ybarra would be questioned as to her alleged drug use and told her that, because this would amount to a probation violation, she could opt not to testify. If she chose not to testify, the State could then decide whether or not to offer her immunity. There was never any indication, however, that the State made any offer of immunity, formal or otherwise. Rather, after hearing the district attorney's explanation of the law, Ybarra denied using drugs that night and, likewise, when she testified at trial, again denied having used drugs.

In addition, even if it could be said that the State's conversation was somehow an offer of immunity to Ybarra, there is no indication that it would have had any effect on her credibility. The offense allegedly committed by Ybarra had no direct connection to the offense for which Robles was accused. No version of events relevant to the crime of which Robles was accused would have had any effect on the outcome of a prosecution for her own alleged drug offense. The

12

prospect of immunity gave Ybarra no incentive to testify against Robles. Rather, the prospect of immunity simply removed any disincentive she had not to testify at all for fear that her testimony would lead to her own prosecution. In such circumstances—where there was neither an offer of immunity nor any indication that such an offer would have affected Ybarra's credibility—we cannot conclude that the district court abused its discretion in denying Robles's motion for new trial. Accordingly, we overrule Robles's fourth point of error.

Having overruled each of Robles's points of error, we affirm the judgment of conviction.

_____

G. Alan Waldrop, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed

Filed: June 11, 2010

Do Not Publish