WR-62,593-04
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 8/24/2015 8:08:08 AM
Accepted 8/24/2015 8:31:19 AM
ABEL ACOSTA
CLERK

RECEIVED
COURT OF CRIMINAL APPEALS
8/24/2015
ABEL ACOSTA, CLERK

**NO. 762351**

**NO. 62,593-04**

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE 232ND JUDICIAL** |
| | § | **DISTRICT COURT OF** |
| | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| | § | **AND** |
| | § | |
| | § | **THE TEXAS COURT OF** |
| **BERNARDO ADAN TERCERO** | § | **CRIMINAL APPEALS** |

## APPLICATION/PETITION FOR POST-CONVICTION WRIT OF HABEAS CORPUS
### AND
## RENEWED MOTION FOR STAY OF EXECUTION

*THIS IS A SUBSEQUENT APPLICATION /PETITION IN A DEATH PENALTY CASE WITH EXECUTION DATE OF WEDNESDAY, AUGUST 26, 2015*

WALTER C. LONG
Attorney-at-Law
P.O. Box 41557
Austin, Texas 78701
512-912-0722 (office phone)
512-912-0722 (fax)
waltlong@aol.com

ATTORNEY FOR APPLICANT

**TABLE OF CONTENTS**

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

I. ILLEGAL CONFINEMENT AND RESTRAINT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. NOTICE TO DISTRICT COURT CLERK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. NOTE ON UNTIMELY APPLICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV. ARTICLE 11.071 SECTION 5 COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

V. PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

VI. FACTUAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     A. FACTS OF THE OFFENSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     B. PUNISHMENT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VII. CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     <u>Claim No. 1</u>: Tercero was denied his rights to a fair trial and due process, as such
     rights are guaranteed by the Fifth and Fourteenth Amendments to the Constitution
     of the United States, and to avoid cruel and unusual punishment, as is guaranteed by
     the Eighth Amendment to the Constitution, by the State's presentation of the false
     testimony of Sylvia Cotera.

IX. CONCLUSION:. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

X. PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

XI. CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

XII. PETITIONER'S OATH. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

| EX PARTE | § | IN THE 232ND JUDICIAL |
| | § | DISTRICT COURT OF |
| | § | HARRIS COUNTY, TEXAS |
| | § | |
| | § | AND |
| | § | |
| | § | THE TEXAS COURT OF |
| BERNARDO ADAN TERCERO | § | CRIMINAL APPEALS |

## APPLICATION/PETITION FOR POST-CONVICTION WRIT OF HABEAS CORPUS
### AND
### RENEWED MOTION FOR STAY OF EXECUTION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Applicant, Bernardo Adan Tercero, by and through his pro-bono counsel, Walter C. Long, and pursuant to the provisions of Article 11.071, Vernon's Ann. C.C.P., presents this his Application/Petition For Post-Conviction Writ of Habeas Corpus and Renewed Motion for Stay of Execution, and as grounds therefore, would respectfully show this Honorable Court the following:

### I.

### ILLEGAL CONFINEMENT AND RESTRAINT

Mr. Tercero is currently being illegally confined and restrained of his liberty by the State of Texas on Death Row in the Polunsky Unit of the Texas Department of Criminal Justice, Institutional Division, in Livingston, Texas. *See* Article 11.14, Texas Code of Criminal Procedure. Copies of the judgment and sentence in this case are attached as **Exhibit 1**.

1

## II.

### NOTICE TO DISTRICT COURT CLERK

This is Applicant's fourth application for habeas corpus relief. Subsection 5(b) of Article 11.071, Texas Code of Criminal Procedure, sets forth the procedures that the convicting court must follow in the event that a subsequent application is filed. The clerk of the court shall:

(1)     attach a notation that the application is a subsequent application;

(2)     assign to the case a file number that is ancillary to that of the conviction being challenged; and

(3)     immediately send to the court of criminal appeals a copy of:

    (A)     the application;

    (B)     the notation;

    (C)     the order scheduling the applicant's execution, if scheduled; and

    (D)     any order the judge of the convicting court directs to be attached to the application.

Tex. Code Crim. Proc. art. 11.071, § 5(b).

Upon receipt of the above documents from the district court clerk, the Court of Criminal Appeals shall determine whether the requirements of Art. 11.071, Sec. 5(a), have been satisfied. Tex. Code Crim. Proc. art. 11.071, Sec. 5(c). The convicting court may not take further action on the application before the Court of Criminal Appeals issues an order finding that the requirements have been satisfied. *Id.*

**In order to assist the Court of Criminal Appeals, this Application/Petition will be filed simultaneously in the Court of Criminal Appeals by (1) electronic means, as required by the new rules, and (2) 10 bound paper copies.**

2

**III.**

**<u>NOTE ON UNTIMELY APPLICATION</u>**

This application is being filed fewer than seven days prior to Mr. Tercero's scheduled execution date on August 26, 2015, and thus is untimely according to this Court's Miscellaneous Rule 11-003.

Motion for stay of execution was filed timely on Tuesday, August 18, 2015, in conjunction with a document entitled "Suggestion for this Court to Reconsider on its Own Motion Mr. Tercero's Second Application for Habeas Corpus, No. 62,593-02, and Motion for Stay of Execution."

Within the Suggestion document, the undersigned made note of a "very concerning" statement given by Ms. Sylvia Cotera to trial counsel's investigator alleging that some of her testimony at Mr. Tercero's trial had been false and that, although attempts to locate Ms. Cotera had been unavailing, investigation of Ms. Cotera would continue. Ms. Cotera ultimately was found and her sworn statement obtained, which forms the basis for the one claim for relief brought in this application.

The somewhat lengthy Statement of Facts in the instant application is essentially equivalent to the Statement of Facts filed in the timely Suggestion document and motion for stay of execution.

The undersigned has attached to this application as **Exhibit 2** a detailed explanation under oath as to the reason for delay in the filing of this document and the claim within.

**IV.**

**<u>ARTICLE 11.071 SECTION 5 COMPLIANCE</u>**

The instant Claim No. 1 is that the State violated Mr. Tercero's rights to fair trial, due process, and to avoid cruel and unusual punishment by unknowingly presenting the false testimony

3

of Sylvia Cotera. This claim could not have been presented previously in a timely initial application or in a previously considered application because the legal basis for the claim was unavailable on May 5, 2008, the date that Mr. Tercero filed his previous application under Article 11.071, Texas Code of Criminal Procedure. Tex. Code Crim. Proc. art. 11.071 § 5 (a) (1). It "was not recognized by or could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state on or before that date." Tex. Code Crim. Proc. art 11.071 § 5 (e).

The unknowing presentation of false testimony claim was first recognized in *Chabot v. State*, 300 S.W.3d 768 (Tex. Crim. App. Dec. 9, 2009), more than a year after Mr. Tercero filed his most recent state habeas application in 2008. The unknowing false testimony due process violation in *Chabot* has been recognized by the Court of Criminal Appeals as a previously unavailable legal basis, allowing for the review of such claims under Section 5 of Article 11.071. *Ex parte Chavez*, 371 S.W.3d 200, 207-08 (Tex. Crim. App. 2012).

## V.

## PROCEDURAL HISTORY

Mr. Tercero is confined pursuant to the judgment and sentence of the 232nd Judicial District Court of Harris County, Texas, in Cause No. 762351, in which Mr. Tercero was convicted by a jury of the capital felony offense of capital murder, specifically, the murder of Mr. Robert Berger in the course of robbing Ms. Michelle Johnson. After the jury affirmatively answered the submitted statutory special issues, the Court sentenced Applicant to death on October 16, 2000.

Appointed counsel Gilbert Villarreal and John Denninger represented Applicant at trial. Appointed counsel Sid Crowley represented Mr. Tercero on direct appeal. Mr. Crowley also

4

represented Mr. Tercero on a Motion for New Trial, in which State misconduct with witness Idalia Lima was alleged. Following a hearing on December 18, 2000, the trial court denied the Motion for New Trial. The judgment was affirmed on direct appeal in an unpublished opinion by the Court of Criminal Appeals on September 18, 2002. *Tercero v. State*, No. 73,992 (Tex. Crim. App. 2002). Mr. Crowley did not file a petition for writ of certiorari in the United States Supreme Court.

Mr. Richard (Dick) Wheelan (now deceased) filed an initial state habeas application in the trial court on May 22, 2002, in which he raised five record-based claims. Petition for Post-Conviction Relief to Vacate Judgment and Sentence, Writ of Habeas Corpus by a Person in State Custody, Application for Stay of Execution and Evidentiary Hearing, *Ex parte Bernardo Adan Tercero*, No. 762351-A, 232nd District Court, Harris County. State Habeas Record [Court of Criminal Appeals clerk's electronic copy; subsequently "SHR"] 000002.

The State answered Mr. Wheelan's application on July 11, 2002. Respondent's Original Answer, SHR 000077. On November 29, 2004, Mr. Tercero filed a pro se motion. Applicant's Motion to Amend Petition for States Habeas Corpus [sic], No. 762351-A, *Ex parte Bernardo Adan Tercero*, 232nd District Court, Harris County. Mr. Tercero's pro se petition then alleged several "claims": 1) essentially a claim that trial counsel were ineffective for failing to investigate a Vienna Convention; 2) a claim that the State presented false testimony by Adalia Lima and committed misconduct with her (the claim that was the subject of the motion for new trial); 3) a claim that the State had withheld evidence that Ms. Lima saw the conflict between Mr. Tercero and the victim and that the victim had shot himself by accident; 4) ineffective assistance of trial counsel for failure to conduct meaningful mitigation investigation; and 5) ineffectiveness of trial counsel for failure to call Sylvia Cotera to give favorable testimony on behalf of Mr. Tercero.

5

On December 1, 2004, the State filed proposed findings and conclusions of law. On December 13, 2004, Mr. Wheelan filed proposed findings and conclusions. SHR 000124.

On June 2, 2005, Mr. Tercero filed a motion requesting the court to replace Mr. Wheelan. Motion for the Appointment of New 11.071 State Habeas Counsel. SHR 000132. On June 10, 2005, the trial court explicitly adopted the State's proposed findings and conclusions of law and recommended that habeas relief be denied. Order, SHR 000153.

On November 16, 2005, the Court of Criminal Appeals denied Mr. Wheelan's application and found that Mr. Tercero's pro se Motion (with claims) constituted a subsequent application barred under Section 5, Article 11.071, and dismissed the five claims within it as an abuse of the writ. Order, November 16, 2005 (per curiam). This is the "application" that Mr. Tercero has asked the Court of Criminal Appeals to reconsider.

**2. Federal Court Proceedings**

On October 24, 2006, Mr. Tercero filed a pro se federal habeas petition in the federal district court in Houston, Texas. On November 10, 2006, Mr. Don Vernay, court-appointed federal habeas counsel, filed an amended federal petition. *Tercero v. Quarterman*, No. 4:06-cv-3384 (S.D. Tex. – Houston). The case proceeded tumultuously through the federal district court, where Mr. Tercero made unsuccessful attempts to fire Mr. Vernay , and filed a number of pro se documents.

The Texas Attorney General answered on June 22, 2007, that Mr. Tercero had not presented any of his claims in a procedurally correct manner: he had defaulted in state court the claims arising from No. 62,593-02, and had not exhausted the remainder. The federal district court stayed the federal proceedings so Mr. Tercero could return to the state courts to present his unexhausted claims, particularly the *Simmons* claim. Mr. Tercero filed his 11.071 application in the trial court on May

6

5, 2008. The Court of Criminal Appeals denied relief on the *Simmons* claim on March 3, 2010. *Ex parte Tercero*, WR-62,593-03 (Tex. Crim. App. Mar. 3, 2010) (unpublished).

The parties returned to the federal district court, where the *Simmons* claim was litigated further. On February 7, 2013, the district court issued an order denying relief and Certificate of Appealability. Memorandum and Order, Case 4:06-cv-03384 (S.D. Tex.—Houston Feb. 7, 2013), at 31. The Fifth Circuit Court subsequently also denied Certificate of Appealability. *Tercero v. Stephens*, 738 F.3d 141 (5th Cir. 2013). On June 30, 2014, certiorari was denied by the United States Supreme Court. *Tercero v. Stephens*, 134 S. Ct. 2876 (2014).

On August 18, 2015, the undersigned filed with co-counsel Michael Charlton in the trial court a Motion to Determine Competency Under Article 46.05, V.A.C.C.P. The trial court denied that motion on Friday, August 21, 2015.

On August 18, 2015, the undersigned alone filed in the Court of Criminal Appeals a "Suggestion for this Court to Reconsider on its own Motion Mr. Tercero's Second Application for Habeas Corpus, No. 62,593-02, and Motion for Stay of Execution," pending at present in the Court of Criminal Appeals.

## VI.

## FACTUAL HISTORY

### A. Facts of the offense.

Bernardo Tercero was convicted on October 16, 2000, of the capital murder of Robert Berger, a tenth grade English teacher at Reagan High School, in Houston, Texas. Mr. Berger was killed as he was dropping off clothes to be cleaned at the Park Avenue Cleaners, 4038 South Braeswood, with

7

his three-year-old daughter Jordan at his side and his wife Melinda Winn Berger witnessing the event from just outside the store.

Besides Mr. Berger and his daughter Jordan, four other persons were present in the cleaners at about 7:00 PM, closing time, when the two Hispanic men entered through the rear door to rob the store: Michelle Johnson, manager and daughter of the store owner (16 SF 226); Dyesha Alberty, an employee who worked one of the counters in the front with Ms. Johnson (16 SF 228); Idalia Lima, who had been employed for about a year by Ms. Johnson to process newly arrived clothes in the middle of the store (*id*.; 16 SF 239); and Idalia's husband Ricardo Denillo Toruno, whose family had previously worked for the Johnsons in the store (16 SF 239) and who was married to Idalia.

Closing the store, Ms. Johnson asked Mr. Toruno to dispose of the day's trash in a bin behind the building. He unlocked a burglar-bar door when he exited the back of the store. Returning from the dumpster, he saw three men standing behind the bicycle shop next door and felt a little afraid when he heard one of the men say "follow him" as he approached the rear door. 16 SF. 159. Before he could secure the door, one of the men put a revolver to his head and ordered him to open it. 16 SF 159-60. Another darker skinned man also entered. 16 SF 162. The man with the revolver ordered Toruno and Idalia, his wife, to move aside into the clothing, and both men went to the front of the store. 16 SF 161-62. Toruno heard cash registers banging and heard "strikes against the wall" that sounded like a body hitting the wall at the front of the store followed by one or two gunshots, accompanied by screaming. 16 SF 163, 167, 171. Then, he saw the two men come back through and leave the store, each with a money drawer in hand, the darker man commenting that they had "done wrong." 16 SF 164.

Dyesha Alberty, a cashier, was tagging clothes at a counter at the front of the store when Mr. Berger entered with his daughter to drop off clothes and struck up a conversation with Ms. Johnson at her counter. 16 SF 184-85. Suddenly, Alberty saw a dark skinned man in dark pants and a sports jacket appear from behind Ms. Johnson and walk around the counters toward Mr. Berger. 16 SF 186-87. Startled, Alberty ran toward the back of the store and then heard a gunshot. She had not seen a gun on the man who had passed her, although he had his hand in his right jacket pocket. 16 SF 188-90. But she saw another man carrying a gun running toward her from the back. 16 SF 191. She did not recall hearing any voices or noises or sounds of struggle before the gunshot went off. 16 SF 194. The "shooter" and the other man both spoke Spanish, but Alberty made out that they mentioned "money." Alberty accompanied them to the front of the store and gave them the cash drawers. 16 SF 194-95. The men immediately departed through the back door. Alberty saw Ms. Johnson holding Mr. Berger's daughter and, jumping over Mr. Berger, who was lying on the floor, she exited the front door and ran across the street for help, hitting Melinda Berger with the door on the way out. 16 SF 196-97. On cross-examination, Alberty stated that she did not recall telling police that she had heard something in Spanish being told to Mr. Berger and that she had heard a fight taking place. 16 SF 221.

Idalia Lima's sister, Marisol Lima, was Mr. Tercero's girlfriend at the time of the offense. 17 SF 93-94. Idalia testified that, on an afternoon in March 1997, she, her sisters Jenny and Marisol, and Mr. Tercero had a meal before church, during which Mr. Tercero asked questions about her store: when it closed, what race the manager was, and how much money came in. 17 SF 97. She testified that, while her sisters were away from the table, Mr. Tercero told her he needed money and was going to rob the store with another person. 17 SF 98-99. She thought it a joke, but then she said he threatened that something would happen to her, her husband (Mr. Toruno, or her child, if she told

anyone. 17 SF 99-100. She also testified that Tercero gave her money the next day to keep quiet and told her he had killed a man with a gun. 17 SF 112-113. Idalia testified that she initially did not tell police what she knew, because she was afraid of Mr. Tercero. 17 SF. 111.

Idalia testified that, after the first man came in the back door, pointing a gun at her and her husband, Mr. Tercero entered and ran to the front of the store asking for the manager in English. 17 SF 106. She also heard Mr. Tercero loudly say "give me the money" in English. An argument ensued between Tercero and the customer, Mr. Berger. She heard the sound of a struggle over the cash boxes. 17 SF 106-07; 136-37. She heard sounds as though one had grabbed the other, and repeated sounds of collision with the wall. 17 SF 138-39. This went on for what she described as "five minutes" before she heard a gunshot. 17 SF 139. The man guarding her and her husband also went to the front. 17 SF 139. Then both men ran back from the front and out the back door with the cash drawers. 17 SF 107-08. The next day, Mr. Tercero told Idalia that he had no intent to kill anyone in the store and "he was trying to wait until there wasn't anyone in the cleaners." 17 SF 141. When he ran past her on the way out of the store, she overheard him tell the accomplice, "I fucked up, I hit him in the head." 17 SF 142.

Michelle Johnson, the store manager, testified that, when Mr. Tercero ran to the front of the store, he passed by her counter and went right up to Mr. Berger, grabbing him by the arm. 16 SF 242, 245. He said something to Mr. Berger, but Ms. Johnson could not understand it. 16 SF 243; 17 SF 40. A "scuffle," "struggle," ensued. 16 SF 243-44. The mens' bodies shifted and moved around as they grappled. 17 SF 49. The men changed positions throughout the fight. 17 SF 54. Not having a "clue" what was happening, Johnson stood at her counter. She said Berger and Tercero were "face to face" and Berger was trying to push off Tercero who was pushing him back toward the front

10

doors. 16 SF 247. This lasted about a minute. *Id*. The men continued to struggle always facing each other and, then, she saw a gun and saw Mr. Tercero shoot Mr. Berger on the back left side of his neck and Berger fall face-forward to the ground. 16 SF 244; 250-51. Tercero backed up and went to the rear of the store. 16 SF 252. Johnson then heard someone asking for money and she retreated to the side holding Jordan, Berger's daughter. 16 SF 252-53. Ms. Alberty gave the cash drawers to the men who fled out the back door. 16 SF 254. Throughout the battle between Tercero and Berger, Johnson never saw Mr. Tercero take his hands away from Berger to reload. 17 SF 52. She also did not know if Berger had fought for the gun, putting his hands on it. 17 SF 52-53.

Melinda Winn Berger, Mr. Berger's wife, waited in the car while he and Jordan went into the store. She testified that, at one point, looking through the store window, she thought she saw her husband falling, 24 SF 48. She looked again and thought, "there's somebody on him," threw open her car door and heard a gunshot. 24 SF 48-49. She wrestled with the door to the store failing to open it. Then Ms. Alberty let her in and she accessed her husband, who was bleeding profusely. 24 SF 49-50. Paramedics took Mr. Berger to the hospital and Melinda stayed with him there until he died the next day. 24 SF 53.

Sylvia Cotera, a young Mexican woman with an eighth grade education, testified that she had known Mr. Tercero for about a month before the crime. 18 SF 219. He was a friend who "would come over and sleep at [her] house." *Id*. She said that, when they were alone, Tercero told her that "he had shot someone trying to rob them" at a cleaners. 18 SF 220. Cotera claimed that Tercero gave her various reasons: (1) he became angry because the man did not have any money, (2) because a child (Jordan) had seen him; and (3) because the man himself "had seen his face." 18 SF 220. She said he expressed "worry" because "there hadn't been enough money" in the haul. 18 SF 221. Cotera

11

testified that she did not go to the police with what she knew because "when the things happened and before" Tercero had threatened her not to say anything. 18 SF 221.  She claimed that he threatened to burn her apartment along with her children if she told anyone. 18 SF 222. After this conversation, Mr. Tercero stayed with Ms. Cotera at her apartment for some days. 18 SF 232. He would periodically communicate with her thereafter. Cotera stated that the only persons she ever talked to about the matters in her testimony were three police officers who came to her house about a week before her testimony. 18 SF 229.

Bernardo Tercero testified that he lived with Marisol Lima and that, when they were having a hard time economically she suggested that she had worked for a time at a dry cleaner and knew there was a lot of money there. 19 SF 25. She thought they could get the money easily and there would be no risks. 19 SF 26. They brought Idalia into the discussion when they went out to eat about one to three weeks before the crime. 19 SF 27. Idalia and Marisol took Mr. Tercero to the store and showed him how they would open the back door around 5:35 PM. 19 SF 30. The plan was for one of the women to signal Tercero with a pager when there were no customers. 19 SF 31.  Paged four ones, it would be clear; paged four zeroes, customers were present and he would need to call Marisol. 19 SF 32. An acquaintance named "Chilango" (a coconspirator whose real name is Jorge Gonzales and to date has not been apprehended) expressed interest in joining Mr. Tercero in the robbery and said he would find the guns. 19 SF 33.

Mr. Tercero testified that he and Gonzales started waiting behind the cleaners around 5:30. 19 SF 34. They got the all ones page and saw the back store door was open. *Id*. Gonzales entered first, detaining Idalia and Mr. Toruno, and Tercero followed, going to the front of the store with the pistol Gonzales had brought him covered in his coat. 19 SF 37-39. Tercero testified that, when he

12

arrived in front looking for the cash register, no one noticed him. So he took out his gun, raised it above his head, and moved the slide on it, making a noise. 19 SF 48. He repeated the action, getting attention, and loudly said, "Give me the money" in English. 19 SF 48-49. Tercero then saw Mr. Berger standing in front of Ms. Johnson's counter. Berger turned to face Tercero and looked him in the eyes. 19 SF 54. Berger was taller than Tercero and weighed some sixty pounds more.[1]  19 SF 83. He started to move slowly and Tercero raised his hand saying "Stop!" 19 SF 53-55. According to Mr. Tercero, he took steps back but Mr. Berger advanced on him and grabbed for the gun. 19 SF 56. He pushed Tercero with his chest and they began a struggle that lasted about two minutes before Tercero tired and the gun went off. 19 SF 60. Tercero was surprised when Berger was shot and fell to the floor. 19 SF 62-63. Tercero and Gonzales grabbed the cash drawers and fled in their car from behind the store. 19 SF 64.

Tercero testified he spent the night with Sylvia Cotera and sold the two guns the next day.[2] 19 SF 65. That same day, Marisol and Idalia demanded to know why Tercero had killed Mr. Berger. He explained that they had struggled over the weapon. 19 SF 66. They discussed how the pager plan had gone awry, with Marisol sending the wrong signal. 19 SF 68. Tercero did not know if, when he pulled the slide back on the gun, any bullets came out. 19 SF 71. He also said Gonzales had given him some bullets he had in his pocket. *Id*. He stated he had not fired that gun before.[3] *Id*. Tercero

---

[1] This testimony about size difference was elicited by the State.

[2] When asked why he kept the guns, although Gonzales brought them to the crime, Tercero stated: "It wasn't a decision that we discussed. That's how these circumstances appeared. And that's why I was the one that was in the front." 19 SF 113.

[3] The direct testimony is remarkable for the amount of times the prosecution was caused to object to the defense leading the witness. After six occasions, 19 SF 24,27,29,36,57,59, Assistant DA Ring asked the judge, "Your Honor, may I have an instruction of Mr. Villarreal discontinue leading his witness?" 19 SF 59. Admonition was given and, then, trial counsel immediately led Mr. Tercero again, causing Ms. Ring to object to counsel testifying. 19 SF 60.

testified that he told Cotera he had been in the robbery and that there had been a fight. 19 SF 112. He said he did not tell her anything about a little girl. 19 SF 113. He testified that Cotera's assertion that he said he shot Mr. Berger for fear he would identify him was a lie. 19 S.F. 114. He denied threatening her, Idalia, and/or Marisol. 19 SF 113.

In addition to fact witness testimony, the State presented forensics testimony from a pathologist, Tommy Brown, and ballistics examiner, Robert Baldwin. Brown testified about the autopsy of Robert Berger. 18 SF 82. Powder marks showed that the shooter was within two feet of Berger when he was shot. 18 SF 110. Brown opined that, with the wound on the left side toward the back of the neck and nick the vertebral artery, the shooter would have been either behind Mr. Berger or would have reached around him. 18 SF 104.

Robert Baldwin opined that two unfired live rounds found in the store were from the same gun. 18 SF 150. Baldwin agreed that the bullets could have been removed from the gun without any attempt at firing. If somebody wanted to remove a round, "they would simply pull the slide back, [and the] bullet would pop out" with the same extractor markings. 18 SF 163. Baldwin found that a bullet could have escaped if one of two persons fighting over a gun were to pull the slide back. 18 SF 164. Baldwin added that the two rounds could have been ejected at the same time, with only one pull on the slide. 18 SF 168-69. One of the rounds had an indention signifying that an attempt to fire it had been made sometime. However, Baldwin testified that, whenever a gun is unloaded, the cartridges are cycled through the chamber and take on extraction marks. Police officers, for example, recycle ammunition, creating extraction marks. 18 SF 172-73. So the live rounds showed no

Moments later, she had to object again, "I object to counsel testifying. Would he please keep it to question and answer. He's leading the witness." 19 SF 69. Right away, another lead. 19 SF 70.

evidence they had been cycled through Tercero's gun on the night of the offense. 18 SF 174. Baldwin concluded he had no way of knowing if either had been cycled or had fallen out of someone's pocket. 18 SF 174.

**Guilt/Innocence Charge**

The jury was instructed on lesser included offenses of felony murder and aggravated robbery. For the jury to convict of felony murder, it would need to find that Mr. Tercero had no intent to cause Mr. Berger's death. 20 SF 15. For the jury to convict of aggravated robbery, it would need to find that the gunshot was accidental. 20 SF 17.

**Guilt/Innocence Argument**

The defense explained to the jury that to find Tercero guilty of capital murder, it would have to be convinced beyond a reasonable doubt that Tercero "had the specific intention, conscious objective or desire to commit the murder. In other words, to have Mr. Berger dead." 20 SF 21. The defense argued that the proof of specific intent was not met. 20 SF 33-35. The shooting unquestionably occurred during a struggle. It was not, the defense argued, a case in which the robber went straight to the cashier and shot. 20 SF 35. Michelle Johnson, Mr. Berger's friend, testified there was a struggle and the crime diagrams showed a struggle that progressed from in front of Ms. Johnson's counter to the front door. 20 SF 38, 40-41. This was inconsistent with the idea that Mr. Tercero just went up to Mr. Berger with intent to shoot him. *Id*. Anticipating that the State might argue that Tercero shot and misfired once at Berger before the shot that killed him, the defense pointed to Tercero's testimony that he moved the slide back and forth on the gun when he went to the front of the cleaners and, consistent with Baldwin's testimony, one or both of the recovered live rounds could have been expelled then. 20 SF 28. Secondly, if the gun had jammed, Tercero would

15

have needed two hands to run the slide to eject the bad round and, significantly, there was no evidence of that. 20 SF 28.

The State countered with a mantra, "[G]uns don't accidentally go off during a robbery. Guns are used to eliminate witnesses during a robbery." 20 SF 52, 53, 55, 59, 60, 66, and 67. The State asserted that intent could be created in a split second. *Id*. All that was needed to show that Tercero intended to shoot Berger and intended to kill him in that act. *Id*. "A gun is used during a robbery to eliminate witnesses, especially when you're as calculated as Bernardo Tercero." *Id*. at 53.

The State's principal argument for intent was: "If [Tercero] didn't have the specific intent to do something to Robert Berger why did he round the counter and approach him?" 20 SF 55. The State argued only three adults saw everything that happened: the deceased, the defendant, and Ms. Johnson, stressing the importance of Ms. Johnson's eyewitness testimony. The State argued that Johnson, like Alberty, said Tercero went straight to Mr. Berger. Johnson said Berger was "defensive." 20 SF 58. Thus, the State argued that, although it is impossible to know what Mr. Berger was thinking, he was not being heroic in the face of a gun with his three year old next to him. *Id*. The State argued that, as soon as Johnson saw the gun,[4] there was no struggle over the gun: just a gunshot. 20 SF 58. The State argued that the horizontal path of the bullet, rather than some crazy angle, showed intent.[5] 20 SF 59-60. The shot in the "back of the neck" was consistent with Johnson's testimony that Berger was trying to get away from Tercero. 20 SF 60. The State found intent to eliminate a witness in Tercero's statement that Berger looked him in the eyes. 20 SF 63. The State

---

[4]  Ms. Johnson testified that the struggle between Tercero and Berger lasted about a minute. 16 SF 247.

[5]  The pathologist also testified that the shot could have occurred with the shooter reaching around Mr. Berger. 18 SF 104.

16

argued that the indented live round on the floor indicated that Tercero tried to eliminate the other witnesses, in particular Michelle Johnson, but the gun jammed, he ejected the cartridge and went to the back of the store.[6] 20 SF 64.  Finally, the State argued that intent was shown by what Tercero said to Sylvia Cotera: that he shot Mr. Berger because the child had seen his face. 20 SF 66.[7]

The jury asked to see Michelle Johnson's entire testimony. 20 SF 70. When asked to be specific, jurors wanted to hear cross-examination of Ms. Johnson about Mr. Tercero's initial approach to Mr. Berger. 20 SF 74. As Assistant DA Hawkins put it, "The question says, the question that Bernardo Tercero rounded counter number two, initiating contact with Mr. Berger, grabbing Mr. Berger's right arm. And when we went through the direct with Mr. Denninger [defense counsel] we looked at the language where he was grabbing the arm other than the path situation."  20 SF 74. It appears from the record that the jury was read snippets of Ms. Johnson's testimony on direct and cross: 16 SF 242 (lines 13-17); 243 (lines 12-15); 245 (lines 2-10); 17 SF 41 (lines 18-23); 43 (lines 12-20); 45 (lines 19-22). 20 SF 75-76. All pertain to Mr. Tercero coming in to her left and grabbing Mr. Berger by the right arm.  Subsequently, the jury found Mr. Tercero guilty of capital murder after deliberating for a long time. 24 SF 100 (Prosecutor: "[I]t took you guys a long time to come to a verdict."). The docket sheet for October 16, 2000, reflects that the jury began deliberations at 12:10 PM and ended at 9:47 PM, including some breaks, returning with a guilty finding.  SHR 000200.

On December 18, 2000, an evidentiary hearing was held on Mr. Tercero's motion for new trial based on alleged misconduct with two witnesses, Idalia Lima and Maria Lucinda Alvarado.

---

[6] This argument is purely speculative. Ms. Johnson, with her eyes on Tercero as he shot Mr. Berger, would have been perfectly capable of testifying that Mr. Tercero also pointed the gun at her if that were true.

[7] The state argued, "The defendant could not touch Sylvia Cotera. There is not one shred of evidence to indicate why she would make this up. None. That's what he said right after the crime."  20 SF 66.

Idalia testified that she had met with Assistant DA Sally Ring prior to trial with DA investigator Gaston Rangel translating. MNT at 8. Idalia stated that, during that meeting, Ms. Ring instructed her on how she was to testify. MNT at 9. Although she had specifically told Ms. Ring that she saw Tercero and Mr. Berger struggle over the pistol, Ms. Ring told her to say that she "did not see anything and that he threatened me." MNT at 8-9; 11. Ms. Ring told her not to say anything in favor of Mr. Tercero, or she would go to jail. *Id*. If she cooperated, Ring said she would give Idalia a letter so she "would not go to jail." MNT at 10. Idalia also testified that she informed the prosecutor she had heard Ms. Johnson say "help me" during the struggle between Tercero and Berger, and was told she "did not have to say that in front of the jury." MNT at 11. On cross-examination with Ms. Ring, Idalia stated she believed the sentence was inappropriate, because "[w]e know very well that there was a struggle and that man died, fought to take the pistol away and . . . it fire by itself." MNT at 17. She was impeached with the fact that she had lied in her first two statements to the police about not knowing who robbed the cleaners. MNT at 17-18. It was pointed out that, in all three police statements, she did not say she could see the scuffle, and Idalia said the police, too, threatened her. *Id*. Idalia told Ring that she had also told her not to divulge that the police had threatened her. MNT at 19-20. Idalia conceded they had had a discussion about whether exonerating things Mr. Tercero had told her would be allowed in under the evidentiary rules. MNT at 22-23.

Maria Lucinda Alvarado, Idalia's mother, testified in corroboration of Idalia's claims. MNT 25, 27, 28. On cross, Alvarado agreed she had received a work permit due to her cooperation with the FBI getting Mr. Tercero to the United States. MNT at 37. She objected to Mr. Tercero's sentence being based on an "exaggeration." *Id*.

18

Gaston Rangel testified at the hearing that, when he and Ms. Ring met with Idalia, she did not tell them she had seen the struggle over the gun, nor did Ms. Ring ever tell Idalia to change her testimony or not mention certain things. MNT at 43. Ms. Ring's co-counsel, Bill Hawkins, also testified denying Idalia's accusations. MNT 54ff. He testified that, in the meeting he attended with Idalia, "[S]he was adamant that she had not seen the struggle." MNT at 59. Hawkins also described how FBI agent Rick Ganway had worked with Idalia Lima, Marisol Lima, and Maria Alvarado to get Mr. Tercero back to the United States. MNT at 63. Marisol Lima also was given a work permit and five to seven thousand dollars for her assistance in apprehension of Mr. Tercero. *Id.* Following brief arguments, the trial court denied the motion. MNT at 71.

**Punishment Phase**

### 1. State Witnesses

The State's punishment phase presentation consisted of four offenses, two misdemeanor theft convictions of Mr. Tercero under an alias, Carlos Arturo Gonzales, in Houston, Texas, in 1994 and 1995 (22 SF 5), prior to the capital murder, and two unadjudicated felony offenses in Nicaragua that occurred after the capital murder and before Mr. Tercero's return to the United States and arrest.

The first of the Nicaragua unadjudicated offenses was armed robbery of then seventeen year old Jose Gonzales Gomez of money he had received for selling watermelons in August 1998 in Chichigalpa, Nicaragua. 22 SF 5,8-9. The man pulled a gun from under a newspaper and threatened to kill Gomez if he did not give over his watermelon money. 22 SF 16-18. He gave the man $300.00 US and the man ran and hopped on a bus. 22 SF 19. Gomez subsequently made a police report. Just before trial, Assistant DA Hawkins and Gaston Rangel showed Mr. Gomez a photo lineup in Nicaragua, in which he identified Mr. Tercero, 22 SF 23.

19

The second Nicaragua unadjudicated offense was a complicated scenario in which three men and one woman kidnapped a taxi driver (putting him in the trunk) in order to use his car for a kidnapping of a child (by the wrenching of the child away from his father in his own car). The somewhat unclear testimony showed that, in the process of the chaotic child kidnapping, Mr. Tercero shot the father in the leg.

Juan Antonio Lezema Arauz, taxi driver, testified that a group of three men and one woman hijacked his taxi in September 1998. A man sitting on the front passenger side, later identified by Mr. Arauz as Mr. Tercero, pulled a gun on him, as did a man in the backseat, who also hit Mr. Arauz on the side of his head. 22 SF 55. *Id*. The man from the front seat told the others to tie up Mr. Arauz and take his things and, after they took his glasses and money, they put Mr. Arauz in the trunk. 22 SF 57-58. Sometime later, when they stopped and the trunk was opened, Mr. Arauz complained about binds on his hands. His hands were unbound and he was given some refreshment through a straw. The front seat passenger told him they would let him go, but that he must not make movements, or "that's as far as [he would] go." 22 SF 58-60. The trunk was closed. Then, after more driving, when the trunk was opened again, the front seat passenger said that they were going to finish him off, but they shut the trunk again and went on. 22 SF 60. After about four hours in the trunk, Mr. Arauz felt the car zig zagging, passing and falling behind another car. As the car stopped, he heard the woman say, "Look, look he don't want to give it." 22 SF 61, 63. A man's voice that he did not recognize said, "Just give him a few shots." 22 SF 63. He heard two shots, heard a child desperately crying as it was put in the taxi, and felt the taxi speed off. 22 SF 63-64. For about forty minutes the taxi sped with Mr. Arauz in great distress in the trunk. Then it stopped and someone said "the police, the police." 22 SF 65. Arauz heard five to seven shots, the child crying, and someone

20

say, "Get the boy." 22 SF 67. He then said, "Don't fire, I am here," and police officers opened the trunk and let him out. 22 SF. 68. He saw that the police had captured the woman and one of the men (not the man from the front seat). *Id*. In September, Mr. Hawkins and Mr. Rangel showed Arauz a photo lineup, in which he identified Mr. Tercero, and he made a courtroom identification of him as the man in the taxi front seat. 22 SF 72-73. On cross, it was revealed that the person who gave Mr. Arauz a refreshment through a straw was the man from the front seat. He also provided Mr. Arauz with some pillows. 22 SF 77. Mr. Arauz admitted that is was unclear to him whether, when the front seat man said something about "finishing" it was about finishing "off" him or finishing what they were doing. 22 SF 78-79. Mr. Arauz had been given the same photo of Mr. Tercero in Hawkins' lineup by a Nicaraguan police commissioner before he was shown the lineup by Hawkins and Rangel. 22 SF 83. Arauz conceded that his captors had guns yet no one hurt him. 22 SF 89.

Daniel Julio Chabarria, the father of the kidnapped four year old, owned a food and a clothing store. On the first of September 1998, Chabarria was driving his 1984 station wagon with his son Daniel about two blocks from his father's house, when he was intercepted by a white car (Mr. Arauz's taxi) that he thought was police. 22 SF 95-96, 99. Two men from the car immediately pulled guns on Mr. Chabarria, one standing to his left at the driver's side window, the other entering the front seat from the right. The man at driver's side told Mr. Chabarria not to move, it was a kidnapping. 22 SF 102. Then, as a woman on the street tried to intervene, the man took the boy from Chabarria's right arm while simultaneously shooting him in the lower left leg below the knee. 22 S.F. 123. The man took the boy to the white car and gave him to the woman in the car. 22 SF. 104. Chabarria simultaneously grabbed for the gun of the other kidnapper in his car who shot him in his hand. Another (or the same) man outside the car fired on him shooting him in the upper leg. He

21

ultimately landed on the ground. 22 SF 105-10. He was taken to the hospital where he gave a written police statement. Chabarria realized that he knew the man (or one of the men) who shot him in the leg, because he had been in his store and he had visited him once in his house. 22 SF 111. One of the man's aunts was an employee of his. *Id*. Thus, he told the police his name, Bernardo Tercero. 22 SF 112. Chabarria agreed that, as Tercero was an arm's length away when he shot him, he could have killed him if he wished, but stated "he did not want to kill me." 22 SF 134.

The State also put on a lieutenant from the Nicaraguan National Police, Luis Gonzales, who testified about his participation in the police response to the Chabarria kidnapping. 22 SF 143. When witnesses reported that three of the assailants had left in a car with the boy and one had run away on foot, police pursued all. They were able to capture the one on foot and borrow citizen cars to chase after the taxi. 22 SF 145. About an hour and ten minutes into the chase, they found the taxi on a dirt road. 22 SF 150. Two men got out of the taxi in a hurry, fled, and then from a distance fired upon Gonzales. 23 SF 5. There was chase, then gunfire again. 23 SF 6-7. Gonzales fired back until his gun jammed. 23 SF 7. He cleared his weapon, fired again, and it jammed again, so he gave up pursuit and the men escaped. 23 SF 7-8. The boy and taxista were rescued. 23 SF 8-9. Gonzales had recognized one of the men who had fired on him from the streets before, where he had observed him wearing jewelry, which was unusual. This was Mr. Tercero. 23 SF 15. Gonzales made subsequent attempts to arrest Mr. Tercero, obtaining photos of him from his family in the process. 23 SF 19.

Gaston Rangel, DA investigator, testified about his trip to Nicaragua with Asst. DA Hawkins to show photo arrays to prospective witnesses who came to testify for the State. 23 SF 68ff. FBI agent Richard Ganway testified about how Mr. Tercero was lured back to the United States through

22

Marisol Lima, who was paid $5,000.00 for her help. 23 SF 100. According to Rangel, Idalia Lima was not so remunerated. *Id.*

## 2. Defense Witnesses

The defense put on eight family and acquaintance witnesses that trial counsel, Mr. Villarreal, personally obtained from Nicaragua right before trial. He introduced them and summed up the defense case by stating he had "[a]pproximately eight witnesses that should be fairly short." 23 SF 103. The brief testimony of all eight was almost identical: Mr. Tercero was a good teenager, had no bad habits, was a good student, helped his grandfather, and could be rehabilitated. Testimony also was presented about how Mr. Tercero helped to rescue victims of Hurricane Mitch, which hit Nicaragua in the last days of October 1998. Some pled for Tercero's life, stating that Mitch had already killed a lot of his family.

Carlos Ruiz Molina, uncle, described Tercero as an excellent teen, having no bad habits, and helping his grandfather Don Francisco clean and plant corn. 23 SF 107. He was raised by his grandparents and never did anything wrong. 23 SF 110. Tercero could be rehabilitated. 23 SF 107. Molina told the jury that the family had already lost sixty members to Mitch and asked for forgiveness on the part of the family. 23 SF 108-110. On cross, Molina was asked if he had been aware of the capital murder, thefts in Houston, and the offenses in Nicaragua. Only the capital murder he had been made aware of "a little bit ago when we were notified." 23 SF 111. He opined that, in light of the crimes, Tercero could be rehabilitated but admitted he had had little contact with him since he was age 19. 23 SF 112.

Gregorio Berrios Alvarez, a fellow industrial machinery repair school student, testified that for four or five years starting at about age 13, he saw Tercero helping his grandfather with the beans

23

and corn on weekends. 23 SF 116. Tercero's family was very poor. *Id*. He was not disrespectful and did not use alcohol or tobacco or swear. 23 SF 117. Tercero was a good student, he studied hard. 23 SF 119. When *defense counsel* asked if he was aware that Tercero had been convicted of capital murder, Alvarez responded, no, that he was not aware of what Tercero had been accused of. 23 SF 118. On cross, Alvarez denied Tercero was "good" at "repair[ing] industrial machinery." When asked to clarify what he meant by "good student," Alvarez replied, "because I would see him study hard." 23 SF 120. He did not know Tercero's grades, but said he made it to his third year. *Id*. The prosecution grilled Alvarez on his lack of knowledge of Mr. Tercero's capital murder offense and the offenses in Nicaragua, questioning how he could believe in Tercero's potential rehabilitation with that record. 23 SF 123-128. On redirect, Alvarez stated he believed in Tercero's rehabilitation because the family was poor but honest and Tercero was a "good boy." 23 SF 128.

Michael Alberto Mondragon, 21 years old, gave brief testimony that he was three and Tercero five when they met and they also went to INO Tech school together. 23 SF 129-30. He saw Tercero often until Tercero was 18. For two years Tercero lived at Mondragon's house during the work week while attending the the industrial school. On direct, Mondragon said Tercero was a "very good" student. 23 SF 130. "He tried to help [other students] that did not understand the classes." *Id*. Tercero was "smart." When Mondragon was asked if Tercero helped him, he answered, "Yes, and also a lot of the fellow students." 23 SF 131.

Gilma Berrios Alvarez testified that she was around Mr. Tercero almost every weekend from when he was two years old until eleven at the house of one of his uncles. 23 SF 166. He lived at her house from age 11 to 18 because he did not have a way to commute home from INO Tech school. 23 SF 168-69. He was good child. 23 SF 167. He helped his family. 23 SF 168. As a teenager, he

24

was "well mannered" with Alvarez. 23 SF 169. He was a "good student" meaning that "he carried good grades." 23 SF 169. He left for the United States at age 18 as a "very simple man . . . due to the poor state in which he lived." 23 SF 171. Defense counsel[8] tells Alvarez that Tercero has been convicted of "capital murder" and she says "I cannot believe it." *Id*. Defense counsel asks if she is aware that Tercero was involved in an armed robbery and a kidnapping in 1998, and she responds that she was unaware. *Id*. When counsel asks if Tercero can be rehabilitated, she responds, "Yes. Because for God there's nothing impossible." Counsel asks if she believes in Tercero, and she replies, "From the deepest part of my heart." 23 SF 172. On cross, the witness admits that she was aware Tercero was a suspect in the kidnapping case from the news and that she did not tell police where he was (adding that she did not know). 23 SF 175. She admitted she would do anything to help him. *Id*.

Maria Auxiliadora Herrera Montalvan, a friend of Tercero's mother, testified that his mother's parents raised him. 23 SF 177. He was a "good working boy" helping his very poor grandparents in the field, picking corn, planting beans, carrying water, and grinding corn. 23 SF 178. In October 1998, Hurricane Mitch caused a mudslide. Montalvan worked with the Nicaraguan Red Cross which was involved in removing bodies and saving live people from the mud. 23 SF 178-179. She saw Mr. Tercero seven times working to help with the mud slide during the fifteen days of the rescue. 23 SF 180. On cross, Montalvan expressed amazement and disbelief at what she has been told about Tercero's offenses, yet said they did not change her view of him being a good person. 23 SF 184-85.

---

[8]  This is the first witness that defense counsel has informed on the stand about Tercero's present conviction and criminal history.  The prosecutor previously had the distinction of asking first, and getting replies from the witnesses that they were ignorant of the offenses.

Luis Antonio Maldonado, a 52 year old man who lived with Mr. Tercero's grandparents and had known him since he was a small child, testified about Hurricane Mitch. 23 SF 186. Mitch took away five communities, killing 2,753 people. Involved in the rescue effort, Maldonado directly saw Tercero over three days taking children and elderly people out of the mud, and transporting them to rescue helicopters. 23 SF 187-88. Tercero lost 60 family members in Mitch. *Id.* When he lived with Tercero as a child, he found him well mannered, "very cordial." 23 SF 188.

Lydia Tercero Hueto, Mr. Tercero's mother, testified that Bernardo is the oldest of six sons and that she and he lived together. 23 SF 191. She never married Jesus Tercero, his father, who in turn never supported Bernardo. 23 SF 191-93. As a boy, Bernardo tried unsuccessfully to have a relationship with his father, who was married to another woman. *Id*. Bernardo was raised by his grandparents, her father Francisco Tercero and mother Amanda Hueto. *Id*. Bernardo was a "very good student." 23 SF 193. Bernardo himself carried her in his arms fifty meters out of the mud of Hurricane Mitch, and she watched him take other people out. 23 SF 194. Ms. Tercero pleaded for mercy from the jury because Bernard was "the oldest son and he is the one that would help me because I am very poor." 23 SF 195. Then she expressed "very much" love for him. 23 SF 196.

Carlos Alonzo Tercero Huerto, Mr. Tercero's uncle, testified that his and Lydia's parents, who raised Mr. Tercero, were very poor with fourteen children whom Bernardo joined in their household. 23 SF 198. The family rented acres to plant and Tercero's grandparents and their older kids worked the acres farming. 23 SF 199. Tercero's father Jesus was a produce grower. 23 SF 197. Heurto and his siblings would tell Mr. Tercero that his father had money, but when he looked for his father his father was offended by Bernardo's poverty. 23 SF 199. One of his step-brothers (with his father's wife) also prevented Bernardo from approaching his father. 23 SF 202. Bernardo wore to

26

school the clothes of his uncle Javier, who was his same age, and sometimes went without shoes. 23 SF 200. Mr. Tercero was a "[g]ood [elementary] student . . . [e]ven though he had to borrow some books from friends." 23 SF 200. Huerto testified that "with difficulty [Mr. Tercero] studied elementary [and] he could not finish junior high. He had to go to a school, medium technical school, also with difficulty because there was no money." 23 SF 200. Trial counsel asked, "What difficulties?" and Huerto replied, "Economic." 23 SF 201. He explained that Tercero would have to ask for rides to school and get up very early. *Id*. He was well mannered, helped his grandparents in the field on weekends, did not use vulgar language or alcohol, and had only one ambition: to "study." 23 SF 203. When he was 18, Mr. Tercero left Nicaragua for the United States, in order to help his grandparents. 23 SF 203. Mr. Huerto testified that Mr. Tercero studied about 2 years in technical school, but "twelve" years overall, including "elementary." 24 SF 4. He went to the "elementary institute" and then the "medium technical school." 24 SF 5. Mr. Tercero stopped going to school to help his grandfather for about three months before leaving for the United States. 24 SF 6. After a year and a half in the United States, Mr. Tercero returned to Nicaragua, where he continued to help his grandparents and an uncle who died in Mitch. 24 SF 7. Sixty family were lost in Mitch. 24 SF 10. Huerto pleaded with the jury for a punishment less than death. 24 SF 16.

Donald Davis, Sergeant in the Harris County Jail, testified that Tercero's only "offense" during pretrial detention was a writeup for "tampering." 23 SF 136. He was found covering the window of his cell with a newspaper, for which he pled guilty and was given three days without privileges. 23 SF 141-42.

Juan Cortez, a Catholic chaplain in the Harris County Jail, appeared at trial and asked the defense attorneys if he could testify on Tercero's behalf. 23 SF 164. He had been in contact with

27

Tercero since his time of arrival in the jail. He had never seen any indication of trouble in Tercero's interactions with other inmates. 23 SF 149. He was observing change for the good in Tercero and sincere spiritual development. 23 SF 150-52. He saw no indication in Tercero that he would be violent again. 23 SF 152. On cross, the chaplain stubbornly refused to state that he could be wrong about Tercero's sincerity and rehabilitation potential. 23 SF 159, 160. The prosecutor asked, "Do you think it's possible that a person that plans crimes . . . might be more difficult to rehabilitate than someone that doesn't plan a crime?" and agrees that someone who manipulates might find rehabilitation harder. 23 SF 162.

### 3. State Rebuttal Witness

Melinda Winn Berger, the wife of the victim, gave victim impact testimony. 24 SF 27ff. In addition to sharing the history of her relationship with her husband and her experience of his death in the hospital, she painfully described how Jordan, their daughter, was still crying herself to sleep at night and seeing a therapist to deal with flashbacks of the crime. 24 SF 58-59. The hardest thing for her, she said, was raising Jordan without Mr. Berger. 24 SF 62.

### Arguments

Defense counsel argued that the defendant shrouding his cell with a piece of paper over its window was a non-violent incident and that he had no other incidents of any kind, including aggression or violence, while awaiting trial in the Harris County jail. 24 SF 72. The chaplain vouched Mr. Tercero was peaceable and a sincere believer. 24 SF 73, 75. Mr. Tercero would peaceably serve a life sentence. 24 SF 78. Counsel criticized the quality of evidence supporting the unadjudicated Nicaraguan offenses. 24 SF 83, 86. Counsel appealed to residual doubt: "If there is a possibility that this would not have been a capital murder case but for the fact that there was a

28

struggle or possibly a fight for the weapon, then do not, do not impose the death penalty in this case."

24 SF 90. In addition to raising residual doubt and an argument that "it's never okay to take the life of another human being, counsel's mitigation argument was confined to:

> You talked about . . . mitigating circumstances. I brought you a poor family. I know some of you got bored when you heard some of that, but I thought it was important for you to know this young man here basically came from extreme abject poverty. Not using it as an excuse, but it's important for you to know that it's not like he starts off the way all of us have had our lives. I know, it's – it starts off that way, comes from a good, hard-working humble family. No doubt about it. All those people are good people.
>
> Talked about how poor he was, how tough his schooling was. You heard that. And I bring you that not for you to consider that as a circumstance, but for you to get just an idea of the picture. We talked about maybe someone doing some deed that could be mitigating. . . He was out there helping [in the aftermath of the mudslide].

24 SF 93-94.

The State initially dismissed Mr. Tercero's family and friend good character evidence in one short paragraph:

> You heard from his family, they said he was a good man, he was a good child. Well he likes his family. They've been nice to him. Well of course he gets along with them. But God forbid . . . you're a target to him. You're somebody he sets his sight on and then he becomes a threat.

24 SF 103. The State returned to argue that Tercero was lucky to have been raised by loving grandparents. "No matter what you do, they're still going to love you." 24 SF 113. "Remember, he was doing okay. He was respectful with his parents no, bad habits [sic], things of that nature. So he wasn't, he wasn't harmed by being raised by his grandparents. No mitigation there." 24 SF 113.

The State undercut poverty as mitigation by simply comparing him to the watermelon salesman, State's witness Jose Gonzales, who said he was "trying to scratch out a living as a fisherman and farmer instead of committing God-awful crimes." 24 SF 114.

29

The State noted that Mr. Tercero had " a lot more education than" some of the other Nicaragua witnesses, yet he was the one "out there committing cap crimes." 24 SF 114.

The State argued the only mitigation that had been presented was the "mud slide rescue," which did not stack up against Tercero's alleged "willingness to commit violent crimes again and again and again." 24 SF 118-19.

The State projected its view of Tercero was that he was a "walking, talking continuing threat. . . . We know that Bernardo Tercero is a master manipulator. He manipulated Idalia and Marisol, he manipulated his victims over in Nicaragua. Not you, not you. He's not going to manipulate you." 24 SF 102. "Folks, you all were judges of that defendant's character when he testified. And you saw and heard the lies that he told you. You know that he can manipulate or tries to manipulate." 24 SF 104. "[T]hink about his role in this deal at Park Avenue Cleaners. Who was the ring leader? That man. Who had the inside, Marisol and Idalia Lima? That man. Who got Chilango or the co-defendant to come along? That man. Who went up to the front and held up everyone at gunpoint? That man. It was very planned out. That's a man who is a threat. All the information he got, all the steps that he took to make sure he was successful." 24 SF 105-106. The State argued that Tercero could have gone back to Nicaragua and sold watermelons. "Instead he chose to be the demon that he is." 24 SF 108. The State argued that Tercero "planned out" the simple watermelon salesman robbery by himself. "He waited until no one else was there. He waited until the bus was ready." 24 SF 109. In reference to the kidnapping, the State argued, "Look at his role. . . . So whose idea do you think this was [to kidnap the businessman's child]? This defendant develops the plan, goes to [the taxi driver and asks him to pick up the group]. . . . Gets his cohorts with him, pretend they're going for a cab ride. Jump Mr. Ledezma, tie him up, put him in the trunk at gunpoint. And who's giving the orders?

30

You heard Mr. Ledezma; it was Bernardo Tercero, tie him up, don't move, don't look at me, I'm going to untie your hands." 24 SF 110. "What kind of beast makes a child the focus of the crime. They were taking that kid for money. The defendant knew that and the defendant planned that." 24 SF 110-111.

As with guilt/innocence, the jury deliberated long and hard on Mr. Tercero's punishment. The docket sheets reflect that the jury began deliberating at 3:15 PM on October 19, 2000, deliberated with two short breaks until 9:30 PM, and recessed until the next day. SHR 000205. The jury resumed deliberating at 9:55 AM on October 20, 2000, took an hour and fifteen minute break for lunch, and returned with its punishment verdict at 2:30 PM.

## VII.
## CLAIM FOR RELIEF

**Claim No. 1: Tercero was denied his rights to a fair trial and due process, as such rights are guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States, and to avoid cruel and unusual punishment, as is guaranteed by the Eighth Amendment to the Constitution, by the State's presentation of the false testimony of Sylvia Cotera.**

The State of Texas violated Mr. Tercero's rights to a fair trial and due process and to avoid cruel and unusual punishment when it unknowingly used the false testimony of Sylvia Cotera to secure his conviction and death sentence. *Ex parte Chavez*, 371 S.W.3d 200, 207-08 (Tex. Crim. App. 2012). Cotera's testimony created a powerful "false impression" about Mr. Tercero's mental status during the offense, establishing intent and motives for the conviction of murder in the course of his robbery of the cleaners. *Ex parte Ghahremani*, 332 S.W.3d 470, 477 n.14 (Tex. Crim. App. 2011) (citing 42 George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and*

31

*Procedure* § 22.53 (2d ed. 2002); *Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *Burkhalter v. State*, 493 S.W.2d 214, 218 (Tex. Crim. App. 1973)).

### A. Standards

The Court of Criminal Appeals has recognized (in a new rule applicable to Mr. Tercero) that the Due Process Clause is violated when the State *unknowingly* uses false testimony to obtain a conviction or sentence. *Chavez*, 371 S.W.3d at 207-08 (quoting *Ex parte Robbins*, 360 S.W.3d 446, 459 (Tex. Crim. App. 2011)). In order to be entitled to habeas relief on the basis of false evidence, an applicant must show that (1) false evidence was presented at his trial and (2) the false evidence was material to the jury's verdict. *Ex parte Weinstein*, 421 S.W.3d 656, 664 (Tex. Crim. App. 2014).

#### 1. False Evidence

In order to determine if a piece of evidence is false, "[t]he question is whether the testimony, taken as a whole, gives the jury a false impression." *Id.* (Citing *Ex parte Gahremani*, 332 S.W.3d 470, 477 (Tex. Crim. App. 2011); *Alcorta v. Texas*, 355 U.S. 28, 31 (1957)). The false testimony need not be perjured—be known by the witness to be false—to violate due process. However, to be a due process violation, "it is sufficient that the testimony was 'false.'" *Chavez*, 371 S.W.3d at 207-08. The false-evidence due-process claim is aimed to ensure that the defendant is convicted and sentenced on truthful testimony. *Id.* at 211.

#### 2. Materiality

"The second prong in a false-testimony claim is materiality, not harm." *Weinstein*, 421 S.W.3d at 665. The use of material false testimony amounts to a due-process violation. False testimony is material if there is a "reasonable likelihood" that it affected the judgment of the jury. "[A]n applicant who proves, by a preponderance of the evidence, a due-process violation stemming

32

from a use of *material* false testimony necessarily proves harm because a false statement is material only if there is a reasonable likelihood that the false testimony affected the judgment of the jury." *Id*. at 665. Some Judges on the Court of Criminal Appeals have questioned the "reasonable likelihood . . . affected" materiality standard as too lenient on the petitioner for unknowing use of false testimony claims. *Ex parte Henderson*, 384 S.W.3d 833, 835 (Tex. Crim. App. 2012) (Price, J., concurring) (agreeing with Presiding Judge Keller that "unknowing use of . . . false testimony" should have a "mid-level standard" of materiality, between the lenient standard for knowing use of false testimony and the "Herculean task" of proving bare actual innocence claims).

Thus, the materiality standard for unknowing use of false testimony may be akin to the *Brady* standard. Under *Brady v. Maryland*, "the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (citing *Brady*, 373 U.S. at 87). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, 132 S. Ct. 627, 630 (2012. "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" *Id*. (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). The question, then, would be whether the false testimony of Sylvia Cotera undermines confidence in the outcome of Mr. Tercero's guilt/innocence or punishment phase.

**B. Factual Basis for False Testimony.**

**1. Sylvia Cotera's Trial Testimony.**

Sylvia Cotera's testified that, when they were alone, Mr. Tercero told her that "he had shot someone trying to rob them" at a cleaners. 18 SF 220. Cotera claimed that Mr. Tercero gave her various reasons or motives: (1) he became angry because the man did not have any money, (2) because a child (Jordan) had seen him; and (3) because the man himself "had seen his face." 18 SF 220. She said he expressed "worry" because "there hadn't been enough money" in the haul. 18 SF 221. Cotera testified that she did not go to the police with what she knew because "when the things happened and before" Mr. Tercero had threatened her not to say anything. 18 SF 221. She claimed that he threatened to burn her apartment along with her children if she told anyone. 18 SF 222. She stated that, after this conversation, Mr. Tercero stayed with Ms. Cotera at her apartment for some days. 18 SF 232. Mr. Tercero left for Nicaragua and called Cotera "several times" from there asking for money. 18 SF 229. She sent him money on one of those occasions. 18 SF 230. Cotera stated that the only persons she ever talked to about the matters in her testimony were three police officers who came to her house about a week before her testimony. 18 SF 229.

**2. Sylvia Cotera's Post-Trial Statement.**

According to a report located by the undersigned in trial counsels' files, made out by the trial investigator, Rudy Vargas, and sent by fax to Mr. Villarreal on December 18, 2000, Vargas met with Ms. Cotera by phone on that date, which also was the date on which the Motion for New Trial Hearing was held. **Exhibit 3** (Rudy Vargas, Supplemental Report #2). Cotera apparently believed that the hearing was to be the next day (December 19th), telling Vargas that "it appeared that there was going to be a hearing tomorrow." *Id.* at 2.

34

### a. Ms. Cotera described giving false testimony.

Mr. Vargas told Ms. Cotera that it was his "understanding that perhaps the DA or the DA investigator had threatened her with charges in order to get her to testify." *Id*. "She stated that it had happened that way" (*id*.):

> Sylvia stated that she invited them (Gaston, Ring, and the other woman) to her house because they wanted to speak to her. . . . Sylvia stated that she doesn't speak any English and that the other two people didn't speak any Spanish either so she directed all her answers to [Mr. Rangel]. . . . Sylvia stated that she practically spoke just with Gaston because he was the only person that [s]he understood. Sylvia stated that Gaston told her that they already had Tercero and that they were seeking the death penalty for him. Sylvia stated that Gaston told her that Bernardo Tercero was accusing her of keeping the money and the gun involved in the crime. Sylvia stated that she was surprised by what he said and she stated that she began to cry. She became afraid and told Gaston how it was possible that Bernardo would lie so much since she helped him so much. Gaston asked her if she was sure and she said that she was. Sylvia stated that she felt that they questioned her like that by accusing her in order to get her to talk. Sylvia stated that they wanted her to react and defend herself and she stated that she spoke the truth.

*Id*. at 2-4. Mr. Cotera stated she was "constantly told that if she didn't cooperate she would be placed in jail since they had an order for her arrest [which] she was never shown." *Id*. at 6.

Ms. Cotera admitted to Mr. Vargas that she did not speak the truth. She told Vargas that she "forgot to say": (1) "that [Mr. Tercero] had said he didn't want to do it, but that there was an exchange of words and a fight" (*id*. at 4); and (2) that Mr. Tercero "was trembling and scared." *Id*. Cotera elaborated that, "when [Mr. Tercero] arrived to her house he . . . told her what had happened and that [Mr. Tercero] was traumatized." *Id*. She stated that Mr. Tercero told her that he and Mr. Berger "argued because [Mr. Tercero] had gone to rob the place. . . [and] that they struggled." *Id*. at 4.

35

Ms. Cotera stated that "it was wrong that it never came out that she supposedly had the weapon there at her house like Gaston had accused her of having." *Id*. at 4. She "wanted to know why the DA had lied to her and told her that [Mr. Tercero] had said that she had the weapon." *Id*. She told Mr. Vargas that "the DA's told her that she had to say that [Mr. Tercero] had killed for pleasure," but that she did not say that in court. *Id*. at 5. She stated that the DA's also told her not to mention "anything about the money and the pistol"— the supposed accusation against her by Mr. Tercero. *Id*. at 5.

When asked if she had testified to something the DA's wanted her to say, Ms. Cotera replied "that the only thing she said on the stand was that when [Mr. Tercero] first arrived he . . . had said that he had had to kill because there was a child witness." *Id*. at 5. But then she said this was not precisely what the DA had asked her to testify. *Id*. She said that when she told the "DA how [Mr. Tercero] had arrived all traumatized and upset and that the DA had tried to change it around to make her think that [Mr. Tercero] killed out of pleasure or just for the heck of it." *Id*. at 5-6. Cotera stated that Mr. Tercero never stated that he had to kill because there was a child witness. "[S]he made the statement on the stand because she was afraid and felt threatened" by the State. *Id*. at 6. She said Mr. Tercero "never said that." *Id*. at 6.

Ms. Cotera stated that "she was scared because she has three children and is here in this country by herself. She stated that she was scared of the law because it can be so powerful." *Id*. at 5. She did not know her legal rights and "didn't know that she didn't have to speak to the DA in the beginning." *Id*. at 5.

For the sake of completion, there is an obscure pair of sentences in the context of description of State pressure on Ms. Cotera to testify against Mr. Tercero in which she seems to have told the

State she was afraid to tell the truth because Mr. Tercero "might come after her." "Sylvia stated that Bernardo used to be real violent and for her not to worry." *Id*. at 6.

Ms. Cotera stated that she spoke to Mr. Tercero's attorney on "the day of the trial," when he came up to her. *Id*. at 4. She stated that he wanted to know what her testimony would be and "she said that she told the attorney that she was going to testify to the truth." *Id*. at 5.

The undersigned has seen no evidence, from what has been disclosed of the prosecutors' files, that Ms. Ring and/or other members of the district attorney's team knew that Ms. Cotera's resultant testimony was false and, thus, would constitute "knowing use of false testimony" according to *Napue v. Illinois*, 360 U.S. 264, 269 (1959), and *Giglio v. United States*, 405 U.S. 150, 153-54 (1972).

> **b. Cotera's statement to Vargas in 2000 shows that her present sworn declaration does not spring from a late-blooming change of heart about the defendant.**

As laid out above, much of what Ms. Cotera attests to in her recent attached declaration (described below) was made known by her to trial counsel's investigator shortly after trial was over. It is not apparent why she did not attend and testify at the Motion for New Trial hearing. As implied by the timing of her phone interview with Mr. Vargas, she may have misunderstood the date of the hearing. Undersigned has had email correspondence with Sid Crowley, who has stated that he has no memory of what occurred.

In any event, Ms. Cotera's exposure of her false testimony is not new. It cannot be seen as a product solely of the fact that Mr. Tercero now faces imminent execution.

37

### 3. Sylvia Cotera's Recent Declaration.

In her attached declaration, Sylvia Cotera attests that the following testimony she gave at trial

was false:

> a. Mr. Tercero said he shot Mr. Berger because he "did not have any money and that's why he was angry." 18 SF 220.

He never talked to me about the amount of money he robbed nor that he was angry because the man did not have very much money. What I said about these things in my testimony wasn't the truth. Declaration at para. 10; **Exhibit 4** (Declaration of Sylvia Cotera [English and Spanish][9]; Declaration of Ann Nisenson).

> b. Mr. Tercero said he shot Mr. Berger "out of fear because a child had seen him." 18 SF 220.

Bernardo did not tell me that the man saw his face and because of this he had to kill him or that he killed the man because the girl saw his face. *Id*. at para. 10.

> c. Mr. Tercero said he shot Mr. Berger "out of fear because he had seen his face." 18 SF 220.

Bernardo did not tell me that the man saw his face and because of this he had to kill him or that he killed the man because the girl saw his face. *Id*. at para. 10.

> d. Mr. Tercero said "there hadn't been enough money." 18 SF 221.

He never talked to me about the amount of money he robbed nor that he was angry because the man did not have very much money. What I said about these things in my testimony wasn't the truth. *Id*. at para. 10.

> e. Ms. Cotera did not go to the police because Mr. Tercero "threatened [her] not to say anything. . . . He said he would burn [her] apartment together with the children." 18 SF 222.

Bernardo called me from Nicaragua some months later. He asked me to send him money. I told him I could not send him very much due to my own responsibilities and he became angry when I told him I couldn't. I had three children and I barely earned enough money to give them what they needed. Bernardo became angry and told me he was going to burn my apartment. I did not take it seriously because truthfully

---

[9] Filed versions of the Cotera declaration have the address redacted. Opposing counsel will be given the address.

38

Bernardo wasn't someone who made you afraid. It was more like a joke than a threat. I remember feeling annoyed more than anything and I changed my cell phone number. *Id*. at para. 4.

I did not stay in silence for fear of Bernardo. The only time that he threatened me was when he asked me for money a long time later. It wasn't like how I testified that he threatened me so I would not tell anyone about the crime. I never took it seriously. I never had fear of him. *Id*. at para. 11.

Additionally, Ms. Cotera attests to Mr. Tercero feeling traumatized and scared, having gotten in a fight with Mr. Berger over the gun and having had the gun go off by accident, shooting and killing Mr. Berger:

He was very traumatized and scared. He felt terrible. He told me that he went to a dry-cleaners to rob it but then a man entered at the same time as Bernardo did. The man was going to drop off his clothes. Bernardo and he got into an argument and they exchanged words. Then a fight ensued. Bernardo told me the man tried to force Bernardo to give him the gun and it fired and the man died. He told me it was a very sad accident.

*Id*. at para. 2.

### C. Sylvia Cotera's false testimony is material.

#### 1. The State used Cotera's testimony to prove specific intent to kill.

In order to get a conviction for capital murder, instead of one of the lesser included offenses with which the jury was charged, the State had to prove that Mr. Tercero not only intended to shoot Mr. Berger, but intended to kill him by shooting him. Faced with only inconclusive physical and and conflicting eyewitness evidence from the crime scene as to Mr. Tercero's *mens rea* when he shot Mr. Berger, the State unknowingly[10] used Ms. Cotera's false testimony that Mr. Tercero said he was

---

[10] Undersigned has found nothing in the State's trial file to suggest that the State knew, or has known, that Ms. Cotera's testimony was false. The undersigned sent his investigator, Ann Nisenson, to review the State's file and specifically instructed her to look for anything having to do with Ms. Cotera, among other things. The State provided Ms. Nisenson with a CD of copies of documents she selected on August 7, 2015. On Cotera, the file contains at pp. 116-143 (of the PDF CD) two copies of an undated letter sent by Mr. Tercero to a supporter referring at one place to Ms. Cotera (p. 1 8) possessing some "legal documents" for him but stating that he had long ago lost her address. At

motivated to kill in order to eliminate Mr. Berger as a witness and, thus, intended to kill him. This enabled the State to argue over and over, like a mantra, "[G]uns don't accidentally go off during a robbery. Guns are used to eliminate witnesses during a robbery." 20 SF 52, 53, 55, 59, 60, 66, and 67. The State asserted that intent could be created in a split second. *Id.* All that was needed to show that Tercero intended to shoot Berger and intended to kill him in that act. *Id.* "A gun is used during a robbery to eliminate witnesses, especially when you're as calculated as Bernardo Tercero." *Id.* at 53.

The State projected intent on Tercero. As the State argued about the victim, Mr. Berger, it was "impossible" to know on the basis of circumstantial evidence and eyewitness accounts exactly what Mr. Tercero was "thinking." 29 SF 58 (re: Berger). The State piled up circumstantial evidence that it found relevant to intent to kill: Tercero "round[ed] the counter and approached [Berger]" (20 SF 55); Ms. Johnson testified Tercero went straight to Berger and Berger was "defensive" (20 SF 58); as soon as Ms. Johnson saw the gun, there was no struggle, just a gunshot (20 SF 58) (when Johnson testified that the struggle between Berger and Tercero lasted about a minute (16 SF 247)); the horizontal path (rather than a hypothetical "crazy angle") of the bullet and the location of the wound in the "back of the neck" (rear side of the head) showed intent (to kill) (20 SF 59-60) (when the pathologist had also testified that the shot might not have been direct, but with the shooter reaching around Mr. Berger, 18 SF 104); it was significant that Tercero testified Berger looked him in the eyes (20 SF 63); and, finally, that the indented live round on the floor indicated that Tercero tried to eliminate the other witnesses, in particular Michelle Johnson, but the gun jammed, he ejected

---

pp. 507-509, the file also contains a 1999 police supplemental report regarding an accusation against Ms. Cotera for making a terroristic threat.

the cartridge and went to the back of the store. 20 SF 64. While Tercero's accomplice, who got short shrift in the State's account, was described as pointing his gun at three different witnesses (Idalia Lima, Ricardo Toruno, and Dyesha Alberty), there was no testimony that Tercero pointed his gun at *anyone*, including Berger.[11] If Tercero really had wanted to eliminate witnesses and if his gun jammed, he had an accomplice with him whose gun also could have been used to eliminate witnesses.

The State established Mr. Tercero's intent to kill with Sylvia Cotera's testimony:

> Folks, even after the crime think about what he said and what he did that points to the intentional and deliberateness of killing Robert Berger. You know, did he tell Idalia that he accidentally shot Robert Berger? There's no evidence of that. There's no evidence at all. Of course, he didn't intend to kill Robert Berger before he went in because he didn't know Robert Berger was going to be in there.

> And there was a fight because Robert Berger was trying to save his own life by trying to get away from this defendant with a gun. He never told Idalia it was an accident. And what did he tell Sylvia Cotera? What did he tell her? "I shot him because he had seen my face." A gun didn't accidentally go off at the Park Avenue Cleaners. That gun was used to eliminate Robert Berger as a witness.

> And folks, to me even more sickening, even more disgusting is what he said about Jordan. Did he say I am so broken up because I killed this man in front of a three-year-old, in front of a little baby? Did he say that to Sylvia Cotera? No. He said he was afraid because the child had seen his face. *The defendant could not touch Sylvia Cotera. There is not one shred of evidence to indicate why she would make this up. None.* She hadn't seen him in three years. None. That's what he said right after the crime. Because that gun didn't accidentally go off during the robbery. That gun was used to eliminate him, Robert Berger, as a witness. He then flees the jurisdiction.

---

[11] The argument that Tercero wanted to eliminate witnesses is purely speculative. Ms. Johnson, with her eyes on Tercero as he shot Mr. Berger, would have been perfectly capable of testifying that Mr. Tercero also pointed the gun at her and tried to shoot her if that were true.

20 SF 65-66 (emphasis added). The jury knew there was evidence that Idalia Lima could have "made up" the inculpatory statements[12] she attributed to Mr. Tercero, because she quite easily could have been charged with crimes related to the offense. As a co-conspirator, her testimony was inherently suspect. The State, thus, relied on Ms. Cotera to establish intent and motive, add doubt to Mr. Tercero's own account of the events, and provide a witness that could not be impeached (either for accuracy or veracity) to resolve doubt the jurors could have had about Tercero's *mens rea*: his specific intent to kill and his degree of criminal responsibility for the purpose of punishment. She was the State's *mens rea* fail safe.

**2. Lengthy Jury Deliberation.**

The long period that the jury was out deliberating at the guilt/innocence phase highlights the materiality of Cotera's testimony. Mr. Tercero, of course, testified himself admitting that he shot and killed Mr. Berger during the robbery of the store. There was no question of his identity as the person who killed Mr. Berger and the only question, therefore, was whether the State had proven beyond a reasonable doubt that he shot Mr. Berger *with the intent to kill him*. 24 SF 100 (Prosecutor: "[I]t took you guys a long time to come to a verdict."). The docket sheet for October 16, 2000, reflects that the jury began deliberations on guilt/innocence at 12:10 PM and ended at 9:47 PM, including some breaks, returning with a guilty finding. SHR 000200.

---

[12] Although she recanted her testimony at the Motion for New Trial hearing, Idalia Lima testified at trial that Tercero threatened that something would happen to her, her husband (Mr. Toruno, or her child, if she told anyone he was going to rob the store. 17 SF 99-100. She also testified that Tercero gave her money to keep quiet and told her he had killed a man with a gun. 17 SF 112-113. Idalia testified that she initially did not tell police what she knew, because she was afraid of Mr. Tercero. 17 SF. 111. The jury easily would have seen this testimony as suspect, as Idalia took pains to keep herself from being indicted. The prosecutors, in turn, emphasized Cotera's lack of a similar motive to fabricate. By her own admission now, Cotera nevertheless — angry at the defendant because of the prosecution's claims about him to get her to talk — testified falsely.

42

The jury at one point asked to see some of the testimony by Michelle Johnson, the manager, obviously concerned with the pieces of circumstantial evidence the State used to try to prove intent to kill. The length of deliberations shows the jury had doubts and, in that context, Ms. Cotera's testimony that *could not be touched by the defendant* had to have affected the jury's decision to convict and, again, its consideration of the level of criminal responsibility that should be commensurate with the death sentence. Cotera was the *only witness* produced by the State at trial who gave inculpatory testimony about the defendant's state of mind at the offense. Nothing remains of such testimony, if hers is removed, except Idalia Lima's report that, as Mr. Tercero left the store, he commented that he had "f–d up." The survival of everyone else but Mr. Berger, when Mr. Tercero's accomplice had a gun that should have been reasonably believed to work (and there was no discussion of killing witnesses), does not support the State's position that Tercero was on a killing rampage. The difference between Mr. Tercero being convicted of capital murder with a death sentence and convicted of felony murder was Ms. Cotera.

## IX.

## CONCLUSION

If the Court of Criminal Appeals grants this application for habeas corpus and, following an evidentiary hearing, the trial court finds Ms. Cotera credible in her recantation of her trial testimony, then Mr. Tercero can show by a preponderance of evidence that, but for Ms. Cotera's false testimony, there is a reasonable likelihood that the outcomes of the guilt/innocence and punishment phases would have been different. *Ex parte Henderson*, 384 S.W.3d 833, 835 (Tex. Crim. App. 2012) (Price, J., concurring) (describing a mid-level standard of materiality).

43

# X.

## PRAYER FOR RELIEF

PREMISES CONSIDERED, Mr. Tercero prays that the Court of Criminal Appeals might: (1) grant his request for a stay of execution, already filed with his "Suggestion for This Court to Reconsider on its Own Motion Mr. Tercero's Second Application for Habeas Corpus, No. 62,593-02, and Motion for Stay of Execution," and re-urged here; and (2) find that this application for writ of habeas corpus meets the requirements of Section 5(a) (1) of Article 11.071, Texas Code of Criminal Procedure, because the legal basis of the instant claim was not available on the date Mr. Tercero filed his previous application; and (3) grant review of the instant application, remanding it to the trial court for an evidentiary hearing on the unknowing false testimony claim regarding Sylvia Cotera; and (4) following such evidentiary hearing and a necessary credibility finding by the trial court, grant Mr. Tercero relief from his conviction or sentence.

Respectfully submitted,

/s/ Walter C. Long
WALTER C. LONG

Walter C. Long
Texas Bar No. 24002491
P.O. Box 41557
Austin, Texas 78704
512-912-0722 (office phone/fax)
512-554-2269 (cell phone)
waltlong@aol.com

## XI. CERTIFICATE OF SERVICE

I, Walter C. Long, do hereby certify that at true and correct copy of the foregoing document will have been served by hand delivery on the 24st day of August, 2015, to the office of Asst. District Attorney Josh Reiss, Harris County District Attorney's Office, 1201 Franklin Street #600, Houston, Texas 77002, and also by email at reiss_josh@dao.hctx.net.

/s/ Walter C. Long
Walter C. Long

## XII. PETITIONER'S OATH

STATE OF TEXAS

COUNTY OF TRAVIS

BEFORE ME, the undersigned authority, on this day personally appeared WALTER C. LONG, a person known unto me and who, upon his oath, did state and depose the following:

My name is Walter C. Long and I am the petitioner in the above and foregoing writ

of habeas corpus. Pursuant to Article 11.14(5), Vernon's Ann. C.C.P., I hereby

swear that the allegations of the petition are true, according to my beliefs.

/s/ Walter C. Long
WALTER C. LONG

SUBSCRIBED AND SWORN TO before me by the said WALTER C. LONG on this the 24th day of August, 2015.

/s/ Gabe Solis
Notary Public
Travis County, Texas

45